**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24-60504 |
| | ) | |
| ERIC RALLS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |

**OBJECTION TO**
**TRUSTEE'S MOTION TO APPROVE AUCTION AND BID PROCEDURES FOR THE**
**SALE AND TRANSFER OF BUSINESS INTERESTS**

PlantSnap Inc. ("**PlantSnap**") objects to the *Motion to Approve Auction and Bid Procedures for the Sale and Transfer of Business Interests* [Docket No. 51] (the "**Bid Procedures Motion**") filed by Areya Holder Aurzada (the "**Trustee**"), the chapter 7 trustee of the bankruptcy estate of Eric Ralls (the "**Debtor**"), and states as follows:

**RELEVANT FACTS**

1. On August 18, 2024, the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). *See* Docket No. 1.

2. Until April 21, 2025, the Debtor's bankruptcy case was jointly administered with the bankruptcy case of EarthSnap, Inc. ("**EarthSnap**") in the case styled, *In re EarthSnap, Inc.*, No. 24-60363 (Bankr. E.D. Tex. June 17, 2024) (the "**EarthSnap Bankruptcy Case**"). *See* Docket Nos. 21, 40.

3. On April 21, 2025, the Court issued its *Order Converting Motion to Convert Subchapter V, Chapter 11 Cases into Chapter 7 Bankruptcy Cases* [EarthSnap Bankruptcy Case, Docket No. 167] (the "**Conversion Motion**"), converting the Debtor's case from one under chapter 11 to one under chapter 7.

4. In the Conversion Motion, the Court held that the Debtor grossly mismanaged his estate, finding that EarthSnap or a non-debtor affiliated entity paid his living expenses, and that "money flows back and forth, up and down, between Mr. Ralls and [his related] entities without clear explanation or disclosure." *See* EarthSnap Bankruptcy Case, Docket No. 167 at 8–11.

5. On April 30, 2025, the Trustee was appointed as the chapter 7 trustee of the Debtor's bankruptcy estate. *See* Docket No. 45.

6. On June 9, 2025, the Trustee filed the Bid Procedures Motion, seeking to sell the Debtor's interests in (i) Digital Earth Media, Inc. ("**DEM**"), (ii) Metaversal Knowledge, Inc. ("**Metaversal**"), (iii) EarthSnap, and (iv) Greenmind, LLC ("**Greenmind**," and collectively, the "**Business Interests**"). *See* Docket No. 51, ¶ 9.

7. PlantSnap has a secured claim against the DEM shares in the amount of $2.5 million. *See* Proof of Claim No. 6-1. DEJ Partners, LLC ("**DEJP**") asserts a secured claim against the DEM shares in the amount of $1.5 million.

**OBJECTION**

**A.    Legal Standard.**

8. "It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); *see also In re Wilson Freight Co.*, 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (stating trustee's "paramount duty" is to obtain the best price). To satisfy this objective, the assets must be exposed to market forces, and competitive bidders must be given sufficient time to evaluate and bid on the assets. *See In re Deep Marine Holdings, Inc.*, Case No. 09-39313, 2010

Bankr. LEXIS 4518, at *9 (Bankr. S.D. Tex. June 2, 2010); *In re Chesapeake Hardwood Prods.*, No. 10-70248-SCS, 2010 Bankr. LEXIS 4916, at *5 (Bankr. E.D. Va. Sept. 23, 2010).

9.  Courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate. *See, e.g.*, *In re Age Ref., Inc.*, No. 10-50501, 2010 Bankr. LEXIS 5724, at *3 (Bankr. W.D. Tex. Dec. 21, 2010) (approving bid procedures where they were "fair, reasonable and appropriate and are designed to maximize the value of the Assets"); *see also In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . provide an adequate basis for comparison of offers, and . . . provide for a fair and efficient resolution of bankrupt estates.").

10. "The principal question the court . . . faces [in analyzing bid procedures motions] is whether [the trustee] in fact exercised good business judgment." *In re Bombay Co.*, No. 07-44084-dml-11, 2007 Bankr. LEXIS 3218, at *12 (Bankr. N.D. Tex. Sept. 26, 2007). "This, in turn, depends on the process engaged in to arrive at the procedures proposed in the Motion." *Id.* As set forth below, the bid procedures, as stated, do not serve to maximize the value of the Business Interests.

**B.    The Bid Procedures Impermissibly Eliminates the Right to Credit Bid.**

11. PlantSnap objects to the Bid Procedures because it eliminates the right to credit bid. Under the Bid Procedures, "only **Qualified Bidders** may participate in the bidding process to purchase the Business Interests." Mot. ¶ 11(b) (emphasis added). A Qualified Bidder is defined as a bidder who "submit[s] to the Trustee an unqualified and binding **all cash bid** of at least $3,000,000.00." *Id.* (emphasis added). Nowhere in the Bid Procedures does the Trustee provide for the right to credit bid. *See generally id.*

3

12. PlantSnap's right to credit bid is guaranteed by the Bankruptcy Code, which provides,

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). Contrary to section 363(k) of the Bankruptcy Code, the Motion sets forth no cause whatsoever for eliminating PlantSnap's credit bid rights and the Court should reject such wholesale elimination. *See generally* Mot. Accordingly, the bid procedures must reflect PlantSnap's and any other secured creditor's right to credit bid.

**C.  The Bid Procedures Appear to Improperly Require a Bidder to Purchase All of the Business Interests.**

13. The Bid Procedures Motion appears to require that Qualified Bidders purchase all of the Business Interests, instead of a portion of the Business Interests. *See, e.g.*, Mot. ¶ 11(b), (c). To the extent the Trustee seeks to require Qualified Bidders to purchase all of the Business Interests, PlantSnap objects because the Trustee makes no effort to show why bids for one or some of the Business Interests will not yield a more favorable result for the estate.

14. The bidding procedures should be amended to reflect the sale of one or some of the Business Interests. First, although the Trustee purports to sell EarthSnap shares, the Debtor does not own EarthSnap shares. The Debtor has testified that Schedule A/B is inaccurate, and that DEM has a 100% interest in EarthSnap. The Trustee cannot sell what the Debtor does not own. *See* 11 U.S.C. § 541(a). Second, forcing a bidder to take the Metaversal and GreenMind shares will likely serve to drive the price down for the DEM shares. Throughout this bankruptcy case, the Debtor has transferred significant funds from Earth.com, Inc. ("**Earth.com**") to Metaversal and GreenMind, which he used as a "management company" for Earth.com, and which he used to pay

4

his personal expenses. In other words, Metaversal and GreenMind were simply instrumentalities used by the Debtor to effectuate fraudulent transfers. The Debtor has repeatedly stated that Earth.com is the only entity earning significant revenue; because DEM has a 100% interest in Earth.com, the entirety of the Business Interests' value likely resides with DEM. Requiring a bidder to purchase all of the Business Interests will likely not serve to maximize the value of the assets. To foster maximum opportunity and flexibility to achieve the highest bid for all of assets, the Court should reject any requirement that bidders purchase all of the assets and require the Trustee to receive and consider bids for some of the Business Interests.

**D.    The Bid Procedures Motion Fails to Require that Bids Allocate the Purchase Price to Particular Assets.**

15.    The Bid Procedures Motion does not require bidders to allocate the proposed purchase price among the Business Interests. Allowing the Business Interests to be sold without allocating the purchase price to the particular interests being sold—and especially those Business Interests that are subject to a lien—impermissibly deprives secured creditors, such as PlantSnap, of the protection of their collateral. *See In re CDX Gas, LLC*, No. 08-37922-h3-11, 2009 Bankr. LEXIS 1391, at *6 (Bankr. S.D. Tex. June 9, 2009) ("The proposed sale, without allocation of a portion of the purchase price to the well as to which Pinpoint asserts a lien, would extinguish Pinpoint's lien . . . ."); *In re Bowen*, 35 F. Supp. 60, 61–62 (E.D. Pa. 1940) (holding two separate properties subject to two separate mortgages could not be sold as a unit); *McFarlin v. McFarlin (In re B.A. Lockwood Grain Co.)*, 225 F. 873, 875 (S.D. Iowa 1915) ("It has been repeatedly held that, where the holder of a lien upon property permits its sale in bulk, together with other property upon which he claims no lien, he is estopped from asserting a lien against any portion of the purchase price."); *see also* Jeffrey Hamilton & Heather Forrest, Bankruptcy Business Acquisitions ¶ 16.06 at 16-4 (Richard N. Tilton ed. 2006) ("When property is sold in bulk, free of liens, the

5

lienholders should insist on an allocation of the purchase price before the sale is approved and should consider opposing any sale where no allocation has been made.").

16. The Bid Procedures Motion cannot treat the Business Interests as a single asset and as if they were not subject to liens. The purchase price should be allocated among specific Business Interests. To accomplish this goal, the matter of allocation is best addressed by the bidders themselves, because they will be evaluating these very issues in formulating a bid. Moreover, without allocating the purchase price amongst the Business Interests, PlantSnap will be deprived of the ability to submit a meaningful credit bid for the DEM shares. The bid procedures must be structured to permit, rather than render meaningless or ineffective, PlantSnap's credit bid rights.

**E.    The Trustee May Not Be Able to Close a Sale Pursuant to the Bid Procedures Motion.**

17. Under the Bid Procedures Motion, the Trustee intends to close the sale of the Business Interests within twenty days after the Court approves the sale. *See* Mot. ¶ 11(d). However, the Trustee may be unable to close the sale on account of the Debtor retaining access to the DEM shares. During this bankruptcy case, the Debtor indicated that the DEM shares were uncertificated shares. However, in connection with the state court litigation, the Debtor provided evidence that the DEM shares are certificated. *See* Exhibit 1. The Trustee should resolve whether the DEM shares are certificated or uncertificated to ensure that she can close on the sale under the timelines established in the Bid Procedures Motion.

**F.    Based on Available Information, the Bid Procedures Are Not Designed to Maximize the Value of the Business Interests.**

**1.    The Bid Procedures Motion does not identify the marketing process.**

18. In the Bid Procedures Motion, the Trustee states that she "contacted several parties to solicit offers to purchase the Business Interests," "is actively marketing the Business Interests for sale," and that she has identified "potential purchasers." Mot. ¶¶ 10, 11(a). However, the

Trustee has not identified who was contacted, how the marketing is taking place, or who are the potential purchasers. *See generally id.* Without this information, PlantSnap cannot determine whether "the field of potential purchasers is limited and readily identifiable," such that the bidding procedures are, as stated, designed to maximize the value of the Business Interests. *Id.* ¶ 12.

> 2. **The Bid Procedures Motion does not identify what due diligence materials, if any, are provided to potential bidders.**

19. In the Bid Procedures Motion, the Trustee identifies only one document which comprises due diligence materials: an appraisal commissioned by the Debtor. The Trustee did not prepare the appraisal and does not vouch for its credibility. The Debtor—who the Court found grossly mismanaged his estate, and who confessed to factual findings establishing conversion, civil theft, and fraud—commissioned the appraisal to escape conversion. Notably, the appraisal was not provided in connection with the conversion hearing, where its contents could have been challenged by the moving creditors, but improperly in a motion to reconsider conversion. *See In re Blixseth*, No. 09-60452-7, 2010 Bankr. LEXIS 585, at *32 (Bankr. D. Mont. Feb. 23, 2010) ("This Court will not approve the Trustee's proposed bidding procedures . . . , particularly where the Trustee's valuation opinion is based solely upon information that is subject to scrutiny . . . ."). Moreover, even if the appraisal was credible, it only addresses the financial condition of Earth.com and EarthSnap. The appraisal does not address the financial condition of DEM, which is particularly concerning on account of Bill Jaris Consulting, LLC filing an objection to the Bid Procedures Motion to ensure potential bidders know of its $500,000 claim against DEM. *See* Docket No. 59.

20. Based on the information available, it does not appear that the Trustee is providing any other information, including the documents used by the appraiser to form its opinion or bank statements, tax returns, financial statements, or other information. This information is necessary to independently verify the self-serving statements provided to and used by the appraisers, such as

7

the arrangement between the Debtor and Innovation HQ, which owns the earth.com domain, that "the $6.0 million will be paid upon a liquidation event for the Company." EarthSnap Bankruptcy Case, Docket No. 176-1 at 20, 57–58.

21. Without the ability to independently verify the information in and obtain information outside of the appraisal, potential bidders are unable to value the Business Interests such that they are willing to pay $3 million for the Business Interests. Stated differently, the bidding procedures are designed to deter interest, because potential bidders are unlikely to spend $3 million on an asset without basic financial information.

### 3. The Bid Procedures Motion does not state whether the DEM shares are being sold free and clear.

22. The Bid Procedures Motion does not state whether the Trustee is selling the DEM shares free and clear of PlantSnap's and DEJP's liens, which only serves to chill the bidding process. The Bid Procedures Motion does not state that PlantSnap and DEJP have a collective $4 million lien on the DEM shares. Assuming the sale is not free and clear, potential unsecured bidders do not understand that the effective floor on the initial bidding price (i.e., the amount necessary to obtain the Business Interests free and clear) is not $3 million, but $7 million. Again, the Trustee does not explain why a potential bidder is willing to spend $7 million on an asset with little to no reliable due diligence materials. *See supra* ¶¶ 19–21. Second, even if a bid is conditioned on a free and clear sale, it is uncertain whether the Trustee can do so. At this time, PlantSnap does not consent to a free and clear sale, and the Trustee has not articulated how she can satisfy the remaining subsections of section 363(f) of the Bankruptcy Code. The Court should require the Trustee to state whether a sale is free and clear or, at a minimum, reflect the fact that PlantSnap and DEJP have a lien on the DEM shares.

    **4.    The $3 million starting bid is not designed to maximize the value of the assets.**

23.    Under the bidding procedures, any bid must be "an unqualified and binding all cash bid of at least $3,000,000.00." Mot. ¶ 11(b). The Trustee provides no justification for starting the bidding process at $3 million, which only serves to chill the bidding process.

24.    The Trustee has committed to selling the Business Interests via an auction, and the price obtained in a competitive bidding process is often the best evidence of its value. *See, e.g.*, *In re Ondova Ltd.*, No. 09-34784-SGJ-11, 2012 Bankr. LEXIS 5429, at *34 (Bankr. N.D. Tex. Nov. 21, 2012). However, the Trustee imposes two conditions, which, together, serve only to deter interested bidders and chill bidding. First, the Trustee is selling the Business Interests without any warranties or representations. *See* Mot. ¶ 9. Second, the Trustee is imposing a $3 million floor on the Business Interests. *See id.* ¶ 11(b). As a result, any potential bidders will need to conduct extensive due diligence to value the Business Interests. As set forth above, it is unclear what reliable information, if any, the Trustee has made available to potential bidders. *See supra* ¶¶ 19–21. Compounding this problem, the Trustee requires bidders to submit bids by July 31, 2025, which amounts to a small, four-week due diligence period. *See* Mot. ¶ 11(b). Rather than allowing potential bidders to make an offer based on available information, and obtaining the highest offer based on that information, the Trustee is asking the impossible and unreasonable task of potential bidders: to spend time and money valuing the Business Interests with little to no reliable information with the hope that they are worth more than $3 million. The bidding procedures are designed to deter from the outset.

25.    Even if potential bidders wanted to participate in the bidding process, the Trustee may forego substantial money on account of the "all-or-nothing" scenario created by setting a $3 million floor on the bidding price. The Trustee will only receive an offer if the Business Interests are worth $3 million. If the Business Interests are worth less than $3 million, say $2.9 million, the

estate receives nothing. The Trustee provides no justification for creating this "all-or-nothing" scenario and foreclosing offers that align with the Business Interests' true value. *See generally* Mot.; *cf. Official Comm. of Unsecured Creditors v. Bouchard Transp. Co. (In re Bouchard Transp. Co.)*, 639 B.R. 697, 716 (S.D. Tex. 2022) (setting a floor on initial bid to induce stalking horse bidder where a "naked auction might result in a very low starting bid price, or not bid at all"). If the Trustee is going to sell the Business Interests "as is, where is," then the bid procedures must remove the $3 million floor, which, in addition to the dearth of reliable information, will only ensure the Trustee receives no bids.

26. The fact that there is an "appraisal" of Earth.com and EarthSnap is irrelevant. First, the appraisal itself lacks trustworthiness. *See supra* ¶ 19. Second, an appraisal is not used to establish a floor on the bidding price, but to ensure a proposed sale price is fair and for valuable consideration. An asset's fair market value is frequently determined at an auction properly marketed and conducted, i.e., subject to market forces. *See In re Stingfree Techs., Inc.*, No. 08-16232bf, 2009 Bankr. LEXIS 3023, at *36 (Bankr. E.D. Pa. Feb. 4, 2009). Although fair market value "may be a function of appraised value," an appraisal is used as a tool to ensure that the sale price, typically obtained outside of an auction, is fair and that the purchaser gave valuable consideration. *Id.*; *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) ("[F]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets." (citation omitted)). In other words, if the appraisal was trustworthy, it could be used to assess the sale price in the absence of competitive bidding; it should not be used to establish the initial sale price in the first place. Accordingly, the Court should remove the $3 million floor on the initial bidding price for the Business Interests.

## CONCLUSION

27. For the forgoing reasons, the Court should revise the proposed bidding procedures as set forth herein, and grant any other relief as the Court deems just and proper.

Respectfully submitted,

Dated: June 30, 2025

*/s/ Patrick R. Akers*
Patrick R. Akers (CO 54803)
MARKUS WILLIAMS YOUNG & HUNSICKER LLC
1775 Sherman Street, Suite 1950
Denver, Colorado 80203
(303) 830-0800
(303) 830-0809 (facsimile)
pakers@markuswilliams.com

Dean E. Richardson (CO 35349)
GOULD & RATNER LLP
1801 Wewatta Street, 11th Floor
Denver, Colorado 80202
(303) 284-1062
(312) 236-3241 (facsimile)
drichardson@gouldratner.com

*Counsel for PlantSnap*

**CERTIFICATE OF SERVICE**

I certify that on June 30, 2025, a copy of the foregoing *Objection to Trustee's Motion to Approve Auction and Bid Procedures for the Sale and Transfer of Business Interests* was electronically filed using the Court's electronic filing system. Notice of this filing will be sent by all parties by operation of the Court's system. Parties may access this filing through the Court's system.

/s/ Patrick R. Akers
Patrick R. Akers (CO 54803)

*Counsel for PlantSnap*