**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11 Subchapter V** |
| | § | |
| **EARTHSNAP, INC. ET AL[1]** | § | **Case No. 24-60363-Consolidated** |
| | § | |
| **DEBTORS** | § | **Procedurally with Case No. 24-60504** |

**DEBTORS' CONSOLIDATED PLAN AND DISCLOSURE STATEMENT**

Dated: January 16th, 2025.

Respectfully submitted,

**THE WILEY LAW GROUP, PLLC**
By: /s/ Kevin S. Wiley, Sr.
Kevin S. Wiley, Sr.
Texas State Bar No. 21470700
325 North St. Paul Street, Suite 2250
Dallas, TX 75201
Telephone: (214) 537-9572
Facsimile: (972) 449-5717
kevin.wileysr@tx.r.com
*Counsel for the Debtors*

---

[1] The last four digits of the corporate Debtor's EIN is 5236.The last four digits of the individual Debtor's SSN is 0447

# TABLE OF CONTENTS

**DEBTORS' CONSOLIDATED PLAN AND DISCLOSURE STATEMENT ... 1**

**Factual Background** ........................................................................................ **2**

**1. Defined Terms and Rules of Interpretation** ........................................... **3**
a. Rules of Interpretation and Construction ................................................ 3
b. Defined Terms ........................................................................................ 4

**2. Background** ................................................................................................. **9**
**a.** Overview of the Debtors and Related Affiliates ...................................... 9
**b.** Services ................................................................................................. 13
**c.** Market and Customers .......................................................................... 13
**d.** Events Leading to the Chapter 11 Filings ............................................ 14

**3. Disclosures** .............................................................................................. **14**
**a.** Legal Structure and Ownership ............................................................ 14
**b.** Current and Historical Conditions ........................................................ 14
**c.** Certain Federal Income Tax Consequences ......................................... 14
**d.** Alternate Combined Plan and Disclosure Statement ........................... 15
**e.** Best Interests Test ................................................................................ 15
**f.** Liquidation Analysis ............................................................................. 16
**g.** Feasibility ............................................................................................. 16
**h.** Acceptance by Impaired Classes—No Longer Required ...................... 17
**i.** Confirmation Without Acceptance by All Impaired Classes ................ 18
**j.** Sources of Information Provided. .......................................................... 18
**k.** Accounting Methodology ...................................................................... 19
**l.** Condition and Performance of Debtor While in Chapter 11 ................. 19
**m.** Future Management of Debtor & Compensation of Management and Insiders 19
**n.** Details Regarding the Plan's Funding & Capital Needs ....................... 19
**o.** Assessment of the Collectability of Accounts Receivable. ................... 19
**p.** Relationships of Debtors with Affiliates ............................................... 19
**q.** Avoidable Transfers & Causes of Action .............................................. 19

**4. Risk Factors** ............................................................................................ **19**
**a.** Bankruptcy Law Considerations ........................................................... 20
1. Parties in Interest May Object to the Plan's Classification of Claims and Interests 20
2. Voting Requirements Deleted ................................................................ 20
3. The Debtors' Ability Able to Secure Confirmation of the Plan Under SBRA Have Been Modified and Greatly Relaxed ...................................................... 20
4. Nonconsensual Confirmation ................................................................ 22
5. Continued Risk After Confirmation ...................................................... 22

6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.................................................................................... 23

7. Debtors May Object to the Amount or Classification of a Claim....................... 23

8. Risks of Non-Occurrence of the Effective Date ................................................. 23

9. Contingencies Could Affect the Votes of Impaired Classes to Accept or Reject the Plan............................................................................................................... 24

a. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results ............................................................................................................... 24

b. Risks Related to the Debtors and the Reorganized Debtors' Businesses............. 25

1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service their Indebtedness ................................................. 25

2. The Reorganized Debtors Will Be Subject to Various Risks and Uncertainties Associated with the Chapter 11 Cases ............................................................... 25

3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business............................................................................................................. 26

4. Financial Results May Be Volatile and May Not be Indicative of Future Financial Performance ...................................................................................................... 27

5. Debtors have Liquidity Needs............................................................................ 27

6. The Debtors Operate in a Highly Competitive Industry ..................................... 28

7. The Reorganized Debtors May be Adversely Affected by Potential Litigation .. 29

8. The Loss of Employees Could Adversely Affect the Debtors' Operations ......... 29

9. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations............... 29

**5. Summary of the Debtors' Assets and Treatment of Claims and Equity Interests .......................................................................................................... 29**

a. Summary of Assets ........................................................................................... 29

b. Summary of the Plan of Reorganization ........................................................... 29

c. Administrative and Priority Claims................................................................... 30

d. Summary of Treatment of Claims and Equity Interests...................................... 32

i. Classification of Claims and Equity Interests (Claims are Consolidated for Both EarthSnap and Ralls).......................................................................................... 32

ii. Treatment of Claims and Equity Interests......................................................... 33

1. Class 1: Secured Claim .................................................................................... 33

2. Class 2: Secured Claim .................................................................................... 33

3. Class 3: Secured Claim .................................................................................... 33

4. Class 4: Secured Claim .................................................................................... 33

5. Class 5: Secured Claim .................................................................................... 33

6. Class 6: Unsecured Claim ................................................................................ 34

7. Class 7: Unsecured Creditors of Professionals ................................................. 35

8. Class 8: General Unsecured Creditors – Scheduled but no POC........................ 35

9. Class 9: Equity Interest of Eric Ralls and H1 Investment.................................. 35

**6. Executory Contracts and Leases................................................................... 35**

**7. Claims Objections .......................................................................................... 35**

**8. Confirmation Procedure** ................................................................................. **36**
a. Hearing ............................................................................................................ 36
b. Procedure for Objecting ................................................................................. 36
c. Requirements for Confirmation ..................................................................... 37
d. Classification of Claims and Equity Interests ............................................... 37
e. Impaired Claims or Equity Interests .............................................................. 37
f. Eligibility to Vote on the Plan ....................................................................... 38
g. Voting Deadline .............................................................................................. 38
h. Acceptance of the Plan ................................................................................... 38

**9. Provisions Governing Distributions** .............................................................. **39**
a. Method of Payment ......................................................................................... 39
b. Distribution Agent .......................................................................................... 39
c. Distributions ................................................................................................... 39
d. Rule for Disputed Claims ............................................................................... 40
e. Undeliverable Distributions and Unclaimed Property ................................. 40
f. Effect of Confirmation of the Plan ................................................................ 41
g. United States Trustee Fees ............................................................................. 42
h. Miscellaneous Provisions ............................................................................... 42
a. Binding Effect ................................................................................................. 42
b. Headings .......................................................................................................... 42
c. Termination of Injunctions or Stays .............................................................. 42
d. Amendment or Modification of the Plan ....................................................... 42
e. Severability ..................................................................................................... 43
f. Revocation or Withdrawal of the Combined Plan and Disclosure Statement ...... 43
g. Exhibits and Schedules ................................................................................... 43
h. No Admissions ................................................................................................ 44
i. Successors and Assigns .................................................................................. 44
j. Implementation ............................................................................................... 44
k. Inconsistency ................................................................................................... 44

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS, THE DEBTORS' COMBINED PLAN AND DISCLOSURE STATEMENT. THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION, OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE THAT IS OTHER THAN OR INCONSISTENT WITH THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE

CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREB

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11 Subchapter V** |
| | § | |
| **EARTHSNAP, INC., ET AL.[1]** | § | **Case No. 24-60363-Consolidated** |
| | § | |
| **DEBTORS** | § | **Procedurally with 24-60504** |

**DEBTORS' CONSOLIDATED PLAN AND DISCLOSURE STATEMENT**

1.      **Earthsnap, Inc**. On June 17th, 2024 (the "Petition Date"), the corporate

Debtor, Earthsnap, Inc. ("Earthsnap or "Debtor") filed a voluntary petition for relief under

Subchapter V, Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with

the United States Bankruptcy Court for the Eastern District of Texas, Tyler Division (the

"Bankruptcy Court"). Without extenuating circumstances, the plan was due within ninety (90)

days of the filing or by September 17, 2024.

2.      On June 24th, 2024, the Meeting of Creditors 341(a) meeting was noticed to be

held on July 24, 2024. [Dkt. #3].

3.      On June 27th, 2024, the Notice of Status conference was set for August 6th,

2024 [Dkt. #5]. Debtor duly filed a plan status report [Dkt. #20] and the status conference was

held on the scheduled date

4.      On July 2nd, 2024, the Debtor filed the original petition, schedules, 20 largest

creditors, and statements of affairs [Dkt. #7, #8, and #9].

5.      On July 22nd, 2024, the Debtor filed an amended petition, schedules, statement

of affairs, and creditor matrix [Dkt. #12, #13, #14 and #15].

---

[1] The last four digits of the corporate Debtor's EIN is 5236.The last four digits of the individual Debtor's SSN is 0447
.

6.      On July 30, 2024, an application to Employ Kevin S. Wiley, Sr was filed [Dkt. #18]. The order approving the application was entered on September 3, 2024 [Dkt. #31].

7.      **Eric Ralls**. On August 18, 2024, an affiliate and related Debtor filed an individual petition for reorganization under Subchapter V, Chapter 11 of Title 11. The related debtor is Eric Ralls ("Debtor or "Ralls"), who owns 86% of a related entity described herein, which in turn owns 100% of the voting stock of the corporate Debtor. Ralls was as threatened with a pre-judgment seizure of this stock based on claims also against the corporate Debtor and all related affiliates described herein

8.      For convenience, both Earthsnap and Ralls are referred to individually and collectively as "Debtors" unless the context requires differentiation.

9.      On August 27, 2024, Earthsnap filed a petition for joint administration [Dkt. #28]. This motion was filed using a negative notice of twenty-four (24) days and was granted no objection after amendments to cure defects by Order entered 10/7/24 [Dkt. #50].

10.     Debtors require an answer on joint administration prior to filing a plan. Debtors also needed more time under recently signed marketing arrangements discussed herein to generate reliable financial pro formas assuring plan feasibility. Debtors' counsel was also hospitalized in November 2024, suffering a severe sodium depletion. All of these events culminated in several motions for an extension of time for Debtors to file a consolidated plan.

**Factual Background**

11.     The Debtor is a small business debtor according to the definition in the Bankruptcy Code and is qualified for Subchapter V of Title 11. The related Debtor is an individual who owns, through an affiliate, the controlling interest in the Debtor and is also qualified for Subchapter V of Title 11.

12.     The Debtors own an application for patent-pending processes focused on nature, the preservation of species, and the global environment. The patent application was filed but has not been approved or granted to date. However, now that the affiliate Earth.com, Inc. has funding from other affiliates as described herein, the process for completing the Patent has been renewed, and the development agreement is to remain on Amazon servers ("AWS").

13.     The Debtors combined proposed plan with the related debtor is as follows:

i. Propose with the secured creditors regarding the Allowed Secured Claim as defined herein based on a contested motion for claim estimation heard prior to or with the hearing on the Confirmation.

ii. Propose a plan where, if the claims estimates described herein are approved, the Allowed Secured claim is paid in full, with a plan for similar payment of 100% of allowed unsecured claims, assuming the Debtors get approval of the claim estimation.

14.     This is the Debtors' Combined Plan and Disclosure Statement (the "Plan") filed on that same date. The Debtors are the proponent of this Plan within the meaning of Section 1129 of the Bankruptcy Code. Under Subdivision V of Chapter 11, Title 11, this disclosure statement is provided at the option of the Debtors for additional information to its creditors that, while not required under that statute, will assist the creditors in determining whether to consent or dissent from the Plan. Whether creditors do assent or dissent, as discussed, will not, however, be determinative of whether the Plan may yet be confirmed over dissenting creditors.

## 1. Defined Terms and Rules of Interpretation

### a.   Rules of Interpretation and Construction

15.     For purposes herein: (i) in the appropriate context, each term, whether stated in the

singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender, (ii) any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) any reference to any existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references to "sections" are references to or sections hereof in the Debtors' Plan; (v) the words "herein," "hereof" and "hereto" refer to the Debtors' Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to sections or subsections are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation hereof; (vii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (viii) any term used in capitalized form herein that is not otherwise defined shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

16.     The provisions of Bankruptcy Rule 9006(a) shall apply in the computing any period of time prescribed or allowed hereby.

**b. Defined Terms**

17.     Unless the context otherwise requires, the following capitalized terms used in this Plan shall have the meanings set forth below:

1.      "*Administrative Expense Claim*" means a Claim for costs and expenses of administration of the estate, including: (a) the actual and necessary cost and expenses incurred after each Debtor's respective Petition Date and through the Effective Date of presenting the Estates and operating the business of the Debtors, (b) professional fee Claims, and (c) statutory see Claims.

2.      "Affiliate" means, with respect to any Entity, "affiliate" as defined in section

101 (2) of the Bankruptcy Code.

3. "*Allowed*" means, with reference to any Claim (i) any Claim against the Debtors which has been listed by the Debtors in its Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (ii) any Claim or Equity Interest arising on or before the Effective Date for which a Proof of Claim has been timely filed before the applicable bar date (x) as to which no objection to allowance has been interposed or (y) as to which any objection has been determined by a final order to the extent such objection is determined in favor of the respective Holder, (iii) any Claim or Equity Interest as to which the liability of the Debtors and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court and for which a Proof of Claim has been timely Filed before the applicable bar date, or (iv) any Claim expressly Allowed hereunder or pursuant to an Order of the Bankruptcy Court; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest, punitive damages, or any fine or penalty on such Administrative Expense Claim or Allowed Claim from and after the Petition Date. Unless otherwise provided in an Order of the Bankruptcy Court, for purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtors may hold or assert against the Holder thereof to the extent such claim may be set off pursuant to sections 502(d) or 553 of the Bankruptcy Code.

4. "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Effective Date to prosecute such Claims or Causes of Action.

5. "*Ballot*" means the ballot forms distributed with the Plan to Holders of Impaired Claims entitled to vote in connection with the solicitation of acceptances of the Plan.

6. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101- 1532 and Chapter V thereof.

7. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Texas having jurisdiction over these Chapter 11 Cases.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure.

9.      "*Books and Records*" means those books, records, and financial systems of the Debtors, including any and all documents and any and all computer-generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, wherever located.

10.     "*Business Day*" means any day other than a Saturday, Sunday, or a "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

11.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

12.     "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtor, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date, or during the course of the Chapter 11 Cases through the Effective Date.

13.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the Chapter 11 case filed for the Debtor under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14.     "*Claim*" means any claim (as defined in section 101(5) of the Bankruptcy Code) against a the Debtors.

15.     "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

16.     "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the Docket of the Chapter 11 Cases.

17.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases.

18.     "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of Debtors' plan of reorganization in the Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

19. "*Confirmation Order*" means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

20. "*Creditor*" means any Entity that is the Holder of a Claim against either of the Debtors.

21. "*Debtor*" means the Debtor, in its capacity as a debtor and debtor in possession.

22. Reserved.

23. "*Disputed*" means every Claim, or any portion thereof, that has not been Allowed pursuant to the Plan or a final order of the Bankruptcy Court and:

    i. if a Proof of Claim has been timely filed by the applicable Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent, or disputed, or in zero unknown amount, and has not been resolved by written agreement of the parties or a final order of the Bankruptcy Court;

    ii. if either (1) a Proof of claim has been timely filed by the applicable bar date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which either Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and orders of the Bankruptcy Court, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a final order;

    iii. that is the subject of an objection or request for estimation filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved, or overruled by final order of the Bankruptcy Court; or

    iv. That is otherwise disputed by the Debtor in accordance with the provision of the Plan or applicable law, which dispute has not been withdrawn, resolved, or overruled by final order.

24. "*Distribution*" means any distribution to the Holders of Allowed Claims.

25. "*Effective Date*" means the first Business Day after the Confirmation Date. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

26. "*Entity*" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

26. "*Equity Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership interest, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and all rights arising with respect thereto that existed immediately before the Effective Date.

27. "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

28. "*Executory Contract*" means a contract, as it may have been amended, restated, or otherwise modified and including any codicils, amendments, exhibits or annexes thereto, if any, to which one or more of the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

29. "*Governmental Unit*" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

30. "*Holder*" means the beneficial holder of a Claim or Equity Interest.

31. "*Impaired*" means, with reference to any Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

32. "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against an affiliated Entity.

33. "*Person*" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

34. "*Petition Date*" means July 14, 2023, the date on which the Debtor Filed the petition for relief commencing the Chapter 11 Case.

35. "*Proof of Claim*" means a timely filed proof of Claim filed against the Debtor in the Chapter 11 Case.

36. "*Reorganized Debtor*" means the Debtor, or any successor or assign thereto, by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, or otherwise, on and after the Effective Date.

37. "*Retained Professional*" means an Entity employed in the Chapter 11 Case in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred in the Chapter 11 Case; or for which compensation has been Allowed by order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

38. "*Schedules*" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtor on August 12, 2020, and any and all

amendments and modifications thereto.

39. "*Statutory Fees*" means any and all fees payable to the United States Trustee pursuant to section 1930 of the United States Code and any interest thereupon, and any fees payable to the Chapter V Trustee.

40. "*United States Trustee*" means the United States Trustee for the Eastern District of Texas and the Chapter V Trustee appointed by the United States Trustee to administer this case.

## 2. Background

### a. Overview of the Debtors and Related Affiliates

18. The corporate Debtor and related affiliates are structured as follows. All of these mentioned companies were formed after Ralls was divested of his interest in PlantSnap, Inc. ("PlantSnap") by the Board of Directors led by DEJ Partners, LLC ("DEJ"), the lead investor.

19. The DEJ investor decided it did not like how Ralls was running the company, PlantSnap, which Ralls had built from scratch over a period of 9 years. Plantsnap was the first mobile app to use Al image recognition and launched in 2017 after 5 years of development. It was Ralls and his team at Earth.com, that invented this Plantsnap mobile app. As discussed herein, Ralls has agreed to allow Debtors to exploit this invention by the aforementioned patent application for the new mobile app, Earthsnap, as discussed herein.

20. Ralls readily admits that he was very naive in signing a very one-sided investor agreement with Dan Johnson, ("Johnson") controlling shareholder of DEJ. Ralls contends Johnson slowly, over time, moved to kick him out and take control of the company, and he eventually managed to do so.

21. When the PlantSnap board led by Johnson kicked Ralls out, DEJ and PlantSnap sued Ralls in almost identical lawsuits in Federal District Court. At the time of the lawsuit, Ralls still owned 76% of the company's stock, which was worth $22 million based on the valuation of the last funding round. He was divested of this stock at the conclusion of the lawsuit.

22.     Ralls contends he was kicked out of the company. He had built the app for 5 years before the company was formed, then served as CEO to build the business over 4 more years. Ralls contends he was left with nothing because every dime he had was put back into PlantSnap over the years. Ralls contends that Johnson knew this, and he is worth over $50 million. By suing Ralls from two entities, PlantSnap. and DEJ. This forced Ralls to defend lawsuits from two different entities, even though both lawsuits were essentially the same and involved allegations of misconduct at PlantSnap.  Ralls attempted to countersue, but with depleted resources, this proved to be impossible.

23.     Ralls contends that Johnson paid the legal bills for DEJ and PlantSnap to sue him with unlimited money. Ralls again contends that he had to somehow defend both lawsuits with very limited funds. Ralls contends that he had to have a personal lawyer, hire lawyers for all the business entities he had formed before and after Plantsnap, and do depositions for both DEJ and PlantSnap. As a result, Ralls was forced into a Colorado Chapter 11.

24.     This case, filed under Case No. 23-11620 filed 4/1/2023, was ultimately dismissed on 12/7/2023 when Ralls, as explained below, accepted he had exhausted his resources and confessed to judgment on a binding term sheet treated in the Plan as an executory contract to be assumed by the Plan. But Ralls contends that when you spend 9 years of your life building an app that was downloaded over 50 million times by people in literally EVERY country on Earth, he could not just walk away and allow them to take it from him and get nothing in return.

25.     An aforementioned, Ralls countersued, but he never had time or money to pursue the countersuits because he was constantly in defense mode, answering motions, discovery, and depositions from two different entities that were suing him for the same company, being paid for by a man with an unlimited budget.

26.     A few months later, after being removed from Plantsnap, Ralls decided to build a new app called EarthSnap and turn his attention to building the website he already owned before forming PlantSanp and Earth.com. However, because his funds were all spent defending these lawsuits and trying to keep his PlantSnap stock, which was worth $22 million in 2021, he had to get investors for the new EarthSnap project.

27.     Ralls formed a company called Digital Earth Media, Inc., and a company called EarthSnap, Inc. Earth.com, Inc. (which owns the Earth.com website) had already been formed in 2016 BEFORE he launched PlantSnap. Therefore, even though there are several adversaries pending in this Court seeking exceptions to discharge, none of them are premised on trade secrets or misappropriation of corporate opportunities of PlanSnap. Since the plan is premised on 100% payment of allowed claims, then the discharge exception is a moot issue unless the debtor defaults on the 100% plan for any allowed claim seeking a discharge exception.

28.     At the hearing on the estimation of claims, the Debtors seek to prevail on the theory that the Allowed Secured Claim of Plantsnap is capped on its terms of the aforementioned binding term sheet ("Term Sheet") for $2.5 million, payable on its terms over a three year period at 8% interest. The assumption and cure negate all confession of judgments that arose on default of the Term Sheet, which includes but is not limited to security in the form of pledges of stock on related affiliates named therein and a $1.5 million judgment for the benefit of DEJ in the event of default under the Term Sheet. Therefore, the DEJ claim is estimated at $0.00, given the default trigger cure.

29.     The tech lawyers Ralls had hired to create these new entities created a structure whereby Digital Earth Media, Inc. ("DEM" or "Digital Earth Media"). DEM would be essentially the holding company that investors would invest in. DEM made a transaction through the lawyers,

whereby it assumed 100% ownership in EarthSnap, Inc. and 100% ownership in Earth.com, Inc. DEM has two shareholders. Ralls owns 86% of the Digital Earth Media Stock, and a minority investor, H1 Investments, LLC ("H1"), owns the other 14% of Digital Earth Media stock. H1 has filed a claim for alleged fraudulent inducement to make this investment in this now highly successful business that, pursuant to attached "Ex. A" earned over $1.2 million last year and is predicted to earn $4.018 million in 2025, with a minimum of 10% increase over the next five (5) years. Debtors will seek to estimate the Allowed Unsecured Claim at $0, given the value of the 14% interest retained under the Plan by H1.

30.     Earth.com, Inc. and EarthSnap, Inc. do not have investors...they are wholly owned subsidiaries of Digital Earth Media.

31.     We next have Metaversal Knowledge, Inc. ("Metaversal Knowledge"). This is an S-Corp that Ralls formed. The sole job of Metaversal Knowledge is to hire and manage contractors to work on the Earth.com website and the EarthSnap app.

32.     Because there is so much overlap between Earth.com and EarthSnap, it made sense to have a third-party manager for both entities so that each entity didn't have to make separate payments and billings to the contractors. 90% of the contractors hired by Metaversal Knowledge work on BOTH entities: the Earth.com website and the EarthSnap app. It would be a mess if we had to make the contractors separate their hours and bill each company separately.

33.     Metaversal Knowledge also pays Eric Ralls as an independent contractor, as well as about 7-12 other people, depending on the month and the kind of work being done on each of the entities. If Metaversal Knowledge's assets are seized and it is taken over by a third party, EarthSnap, Inc. will suffer because no one will manage the EarthSnap app, which means that the EarthSnap app can't earn revenue to repay creditors.

34.    It also means that Eric Ralls, the founder/CEO/manager/everything of EarthSnap and Earth.com, will not be paid and will be forced to get another job. If the founder/CEO/everything person, Eric Ralls, has to get another job, EarthSnap, Inc. can't possibly recover and earn the revenue required to pay creditors and earn a profit for its investors.

35.    As a partial solution, Ralls formed Greenmind, LLC to take over the management and payment responsibilities.

36.    Each of these affiliates are controlled by Ralls and are signatories to the Plan Support Agreement attached as Ex. "A."

**b.  Services**

37.    Earth.com is a massive website with around 4 million pages of content...lots of news and images, plus one page for every plant and animal species on Earth.

**c.  Market and Customers**

38.    EarthSnap is an app similar to PlantSnap. The difference is that PlantSnap only identifies plants, but EarthSnap identifies both plants AND animals...all living things.

39.    When you snap a photo with the EarthSnap app of a bird, an Al algorithm on the AWS servers identifies the bird. It then sends back the answer to the app, and this "answer" to the photo taken includes information about the bird species. The information about the bird species comes from the Earth.com website shared with Earth.com. Rather than create an entire new database and replicate the species information already on Earth.com, EarthSnap simply uses the Earth.com information. If Earth.com went down or was taken over during a bankruptcy proceeding or assets were seized from a default judgment or "confessed" judgment, the EarthSnap app would no longer work.

40.    This is the reason that Earth.com, Inc. cannot be separated from EarthSnap, Inc.

during a bankruptcy restructuring. If Earth.com is harmed, then it will be impossible for EarthSnap, Inc. to restructure and earn the revenue needed to satisfy creditors.

41.     This is ALSO the reason that Earth.com and EarthSnap share the same account on AWS...because they share all of the same content and are both owned by the same company, Digital Earth Media, Inc.

### d.  Events Leading to the Chapter 11 Filings

42.     Described above.

### 3. Disclosures

### a.  Legal Structure and Ownership

43.     Debtor's business interest is described in the introduction, Supra

### b.  Current and Historical Conditions

44.     Already Discussed Above.

### c.  Certain Federal Income Tax Consequences

45.     The confirmation and execution of this Plan may have tax consequences for Holders of Claims and Equity Interests. Debtors do not offer an opinion as to any federal, state, local, or other tax consequences to holders of claims and equity interests as a result of the confirmation of this Plan. All holders of claims and equity interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Plan. This Plan is not intended, and should not be construed, as legal or tax advice to any creditor, equity interest holder, or other party in interest. However, it is clear from existing tax rules that cancellation of any claim, right, or interest, including, but not limited to, cancellation of contingent, disputed, and unliquidated claims of the minority shareholders and/or cancellation of the debt owed by the Estate to the Debtor, both in response to and in exchange for treatment under the Plan,

resulting in no ordinary income event to the holder of the debt under 11 U.S.C. §1146 et al. This tax result is a major incentive to the planning process in lieu of other options.

### d. Alternate Combined Plan and Disclosure Statement

46.     If this Plan is not confirmed, the Debtors, or any other party in interest under original Title 11, Chapter 11, could attempt to formulate a different plan. However, only the Debtors have the right to formulate a plan under the Small Business Reorganization Act ("SBRA") under 11 U.S.C. §1189(b) *Et seq*. This exclusive right serves to avoid additional costs – including, among other amounts, additional professional fees – that would constitute Administrative Expense Claims (subject to allowance) that may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to Chapter 7. The Debtors believe that the conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code will result in the incurrence of significant additional fees and expenses to the detriment of the Creditors. If Debtors continue to operate, they will have the revenue to make payments to creditors in addition to the fixed payments made on the Effective Date. Accordingly, the Debtors believe that the Plan enables creditors to realize the best return under the circumstances.

### e. Best Interests Test

47.     Old Section 1129(a)(7) of the Bankruptcy Code required that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. Continued operations will generate revenue by which the Debtors will be able to make additional payments to creditors under the Plan in addition to the fixed payments made on the Effective Date. This test of consent or receipt of not less than liquidation was the "best interest" test.

48.     However, under SBRA, 11 U.S.C. 1191(d), this "best interest" requirement is changed by either consent or no consent, the plan proposes all disposable income for 3-5 years be distributed to creditors, or equal to or greater than the equivalent of this amount. The Plan satisfies this requirement by providing 100% of Allowed Claims, either at the closing of the sale, or pursuant to their terms.

49.     Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, the value of any Distribution to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code would be less than the value of Distributions under this Plan, although this is no longer the test under SBRA for "best interest." This is because the conversion of the Chapter 11 Cases to Chapter 7 cases would require the appointment of a Chapter 7 trustee and, in turn, such Chapter 7 trustee's likely retention of new professionals. This would add additional costs to the Estates and delay compared to the time of Distributions under this Plan. Debtors believe that the Estates would have fewer funds available for distribution in a hypothetical Chapter 7 liquidation than they would if this Plan is confirmed, and therefore, Holders of Allowed Claims will recover less in the hypothetical Chapter 7 cases. Accordingly, the Debtors believe that the "best interest" test of even the old Bankruptcy Code Section 1129 is satisfied, though again, meeting that version of the "best interest" test is no longer required.

### f.  Liquidation Analysis

50.     Given the 100% payment, hypothetical liquidation is mooted.

### g.  Feasibility

51.     Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Plan is not likely followed by the liquidation, or the need for further financial reorganization, of the

Debtors or any successors to the Debtors under the Plan unless such liquidation or reorganization is proposed in the Plan. This test still appears to be a test for a Plan under Section 11 U.S.C. § 1191(a).

52. Since the Plan's Support Agreement handles all claims, including but not limited to the major secured , unsecured, administrative, and priority tax claims, and lack of default on other current obligations, which are adequately provided for under income projections in Ex. "A," feasibility test is met.

**h. Acceptance by Impaired Classes—No Longer Required**

53. Prior to SBRA, the bankruptcy code required, as a condition of confirmation that each class of claims of claims or equity interests impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan, and therefore, solicitation of acceptances with respect to such a class is not required.

54. Section 1126(c) of the Bankruptcy Code defined acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims would have voted, before SBRA, to accept the Plan only if two-thirds in amount of the allowed interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

55. If a class contains claims eligible to vote and no Holders of Claims eligible to vote in such Class voted to accept or reject the Plan, the Holders of such Claims in such Class were deemed to have accepted the Plan.

56. As discussed below, SBRA makes this requirement of at least one impaired class obsolete.

### i. Confirmation Without Acceptance by All Impaired Classes

57.    Prior to SBRA, Section 1129(b) of the Bankruptcy Code allowed a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class without consideration of votes of insiders. Thus, pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan would be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan did not "discriminate unfairly" on the creation and treatment of classes, and was "fair and equitable" with respect to each class of claims or equity interests that are impaired under it, and have not accepted as those terms were defined under that statute.

58.    As mentioned above, however, SBRA under 11 U.S.C. §1181(a) and §1191(b) deletes the requirement of at least one impaired class as long as the disposable income factor is met. SBRA then further substitutes for the fair and equitable test under old 11 U.S.C. 1129(b) that the test is met if the Plan proposes to distribute all disposable income as defined or the equivalent to disposable income. This Plan proposes that distribution of the equivalent to disposable income. Under the old fair and equitable test, Debtors could not retain equity in the reorganized Debtors without the consent of all creditors, or at least one impaired class accepted the plan, and the Debtors' equity retained their interest with the provision of new value in the form of new investment into the Debtors. This test is obsolete under SBRA.

### j. Sources of Information Provided.

59.    In preparing this combined plan and disclosure statement, the Plan Debtors reviewed and relied on the information contained in its Books and Records and customer feedback regarding future orders and revenue. Assumptions include the homestead's market value,

exceeding both Allowed Secured Claims and priority tax claims.

### k. Accounting Methodology

60.     The Debtors' accounting methodology used in preparing their financial information is cost accounting. Straight-line depreciation is used for the depreciation of assets.

### l. Condition and Performance of Debtor While in Chapter 11

61.     See Exhibit "B" for actual results from operations.

### m. Future Management of Debtor & Compensation of Management and Insiders

62.     The Debtors' management will continue to be led by Ralls.

### n. Details Regarding the Plan's Funding & Capital Needs

63.     Debtors do not intend to sell any additional capital assets to fund the Plan. With current business and anticipated future business, as reflected in the projections of **Exhibit A**, Debtors believe that they will be able to meet their financial obligations as set forth in this Plan.

### o. Assessment of the Collectability of Accounts Receivable.

64.     Not applicable.

### p. Relationships of Debtors with Affiliates

65.     Already discussed.

### q. Avoidable Transfers & Causes of Action

66.     Not applicable.

### 4. Risk Factors

67.     Holders of Claims and Equity Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although many risk factors are discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### a. Bankruptcy Law Considerations

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

68.     Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interest in the class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement because the Debtors created Classes of Claims and Interests, each encompassing Claims or Equity Interests, or hybrids of same, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Voting Requirements Deleted

69.     As aforementioned, voting requirements under SBRA are dramatically revised. As a result, the consent of creditors is no longer required to confirm a plan over dissenting creditors. Therefore, it is inconceivable that a plan will not be confirmed due to failure to meet voting requirements.

### 3. The Debtors' Ability Able to Secure Confirmation of the Plan Under SBRA Have Been Modified and Greatly Relaxed

70.     As previously discussed, old Section 1129 of the Bankruptcy Code before the SBRA set forth the prior requirements for confirmation of a Chapter 11 Plan and required among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non- accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan (the "feasibility test"); and (c) the value of the distributions to the non-accepting holders of claims or equity interests within

a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, which was the so-called "best interest test."

71.     As analyzed, SBRA, 11 U.S.C.§1191(b), eliminates the so-called "best interest test" and replaces it with disposable income. It also eliminates the separate disclosure statement while not insisting that there be "adequate disclosure" in the Plan itself. This separate disclosure statement then goes beyond SBRA to ensure that there is no problem.

72.     Sections 1181(a) and 1191(b) of SBRA likewise dispose of the "fair and equitable" test, which used to mean that the Debtors could not retain equity without the consent of creditors, payment of 100% of claims, or proposing new value.

73.     Even with the more liberalized results of SBRA, there is no assurance that the Bankruptcy Court will confirm the plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this disclosure or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the disclosure statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the other statutory requirements for Confirmation not modified by SBRA are not met. If the Bankruptcy Court does not confirm a Chapter 11 Plan or reorganization, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims or Equity Interests against them would ultimately receive with respect to their claims or interests.

74.     The Debtors, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well

as any Class junior to such non-accepting Class than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

### 4. Nonconsensual Confirmation

75.     As aforementioned, in the event that any impaired class of claims or interests does not accept a Chapter 11 Plan, a bankruptcy court may nevertheless confirm a plan under SBRA that the proponent requests if the Plan proposes to distribute the "disposable income" of the Debtors or the equivalent thereof for at least three (3) years and, as to each impaired class that has not accepted the plan, the bankruptcy court, determines that the plan therefore "does not discriminate unfairly" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with Section 1191 of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 5. Continued Risk After Confirmation

76.     Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, and potential revaluing of their assets due to the Chapter 11 proceedings. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no

guarantee that a Chapter 11 Plan of reorganization reflecting the Plan will achieve the Debtors' goals.

**6.  The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

77.      If a bankruptcy court finds that it would be in the best interest of the creditors and/or the debtors in a Chapter 11 case, the bankruptcy court may convert a Chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code. In such an event, a Chapter 7 trustee would be appointed to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under Chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a Chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) the possibility of additional expenses and Claims.

**7.  Debtors May Object to the Amount or Classification of a Claim**

78.      Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in the disclosure statement provided herein cannot be relied on by a Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this disclosure.

**8.  Risks of Non-Occurrence of the Effective Date**

79.      Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will occur since the Effective Date depends on no third parties filing an appeal of the Confirmation

Order. Debtors do not believe there is a likelihood of such an appeal, or if the Confirmation Order is appealed, that the result would be a reversal of the Confirmation Order.

### 9. Contingencies Could Affect the Votes of Impaired Classes to Accept or Reject the Plan

80. The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which would affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by Impaired Classes.

81. The estimated Claims and creditor recoveries set forth in this disclosure are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of claims may vary from the estimated Claims contained in this disclosure. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### a. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

82. The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this disclosure represent the Debtor's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the domestic and world economies in general, and the industry segments in which the Debtors

operates in particular. A substantial part of the risk of continued operations is negated by the Debtors providing lump sum estimated payments of actual results. Thus, if actual results are poorer, then all the risk is on the Debtors. The tradeoff for this certainly is the creditor does not benefit if operations are materially greater than projected results.

**b. Risks Related to the Debtors and the Reorganized Debtors' Businesses**

**1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service their Indebtedness**

83.     This risk, as above analyzed is negated by a lump sum payment of estimated disposable income.

**2. The Reorganized Debtors Will Be Subject to Various Risks and Uncertainties Associated with the Chapter 11 Cases**

84.     For the duration of the Chapter 11 Cases, the Debtors' operations, including their ability to execute their business plan, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:

- the Debtors' creditors or other third parties may take actions or make decisions that are inconsistent with and detrimental to the plans the Debtors believe to be in their best interests;

- Debtors may be unable to obtain court approval with respect to certain matters in the Chapter 11 Cases from time to time;

- the Bank Court may not agree with the Debtor's objections to positions taken by other parties;

- the Debtors may not be able to confirm and consummate the Plan or may be delayed in doing so;

- the Debtors may not be able to obtain and maintain normal credit terms with vendors,

strategic partners, and service providers;

- the Debtors may not be able to continue to invest in its products and services, which would hurt their competitiveness;

- the Debtors may not be able to enter into or maintain contracts that are critical to its operations at competitive rates and terms, if at all;

- the Debtors may be exposed to risks associated with third parties seeking and obtaining court approval to (i) terminate or shorten the Debtor's exclusivity period to propose and confirm the Plan, (ii) appoint a Chapter 11 trustee or (iii) convert the Chapter 11 Cases to chapter 7 liquidation cases; and

- the Debtors' customers may choose to do business with its competitors.

85. These risks and uncertainties could affect the Debtor's business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could affect the Debtors' ability to compete for new business and possibly affect the relationships with business partners, vendors, and employees. Because of the risks and uncertainties associated with the Chapter 11 Cases, the ultimate impact of events that occur during these proceedings will have on the Debtors' business, financial condition, and results of operation cannot be accurately predicted or quantified.

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business

86. The Debtors' future results will be dependent upon the timely and successful confirmation and implementation of a plan of reorganization. If a restructuring is protracted, it could adversely affect the Debtors' operating results, including their relationships with advertising customers, business partners, and employees. The longer the Chapter 11 Cases continue, the more likely it is that the Debtors' advertising customers will lose confidence in the Debtors' ability to

reorganize their business successfully and seek to establish alternative commercial relationships. If the Debtors experience a protracted reorganization, there is a significant risk that the value of the enterprise would substantially be eroded to the detriment of all stakeholders.

87.     So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with administration of the Chapter 11 Cases.

### 4.     Financial Results May Be Volatile and May Not be Indicative of Future Financial Performance

88.     During these Chapter 11 Cases, the Debtors' financial results may be volatile, as restructuring activities and expenses may significantly impact their financial statements. As a result, the Debtors' historical financial performance may not be indicative of their financial performance after the Petition Date.

### 5.     Debtors have Liquidity Needs

89.     The Debtors' ability to fund its operations and capital expenditures requires a significant amount of cash. Debtors' principal sources of liquidity historically have been cash flow from operations. If the Debtors' retention of this cash is interrupted by events in this case, or cash flow from operations decreases as a result of market conditions, demand for their services, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenue over time.

90.     The Debtors thus face uncertainty regarding the adequacy of their liquidity and capital resources and, during the pendency of these Chapter 11 cases, may have limited access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for these Chapter 11 cases and expect to continue to incur significant professional fees and costs throughout.

Debtors cannot guarantee that uninterrupted cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to these cases until the Debtors are able to emerge from bankruptcy protection.

91.     Debtors' long-term liquidity requirements and adequacy of their capital resources are difficult to predict at this time. The Debtors' liquidity, including the ability to meet ongoing operational conditions obligations, will be dependent on, among other thing;, 1) its successful exploitation of the global business opportunity; 2) its ability to maintain adequate cash on hand; 3) its ability to generate cash flow from operations; 4) its ability to develop, confirm, and consummate a Chapter 11 plan or other alternative restructuring transaction; and 5) the cost, duration, and outcome of the Chapter 11 cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.

**6.      The Debtors Operate in a Highly Competitive Industry**

92.     The Debtors operate in a highly competitive industry and may be unable to maintain or increase their current revenues following the emergence of these Chapter 11 cases. The Debtors competes with other competing AI apps now formed and being created. Sales revenue and market share are subject to change for various reasons, including consolidation of the Debtors' competitors through processes such as mergers and acquisitions, which could have the effect of reducing the Debtors' revenues in certain markets. The Debtors' competitors may develop technology, services, or advertising media that are equal to or superior to those the Debtors provide or that achieve greater market acceptance and brand recognition than the Debtors achieve. It is also possible that new competitors may emerge and rapidly acquire market share from the Debtor. The Debtors' ability to compete depends in part on the Debtors' ability to achieve a competitive cost

structure.

**7.     The Reorganized Debtors May be Adversely Affected by Potential Litigation**

93.     The Debtors may be parties to litigation in the future the effect of any potential litigation can be detrimental to the Reorganized Debtor's finances.

**8.     The Loss of Employees Could Adversely Affect the Debtors' Operations**

94.     Not applicable.

**9.     Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

95.     The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With a few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of a plan of reorganization 1) would be subject to compromise and/or treatment under the plan of reorganization and/or (2) would be discharged in accordance with the terms of the plan of reorganization. However, there can be no assurance that the aggregate amount of such claims that are not subject to treatment under the Plan or that are not discharged will not be material.

**5.  Summary of the Debtors' Assets and Treatment of Claims and Equity Interests**

**a.   Summary of Assets**

96.     The Debtors filed schedules of all of their assets and liabilities on J. Complete copies of the schedules are available from the Clerk of the Court. The primary assets of the bankruptcy estate and their estimated values are reflected in the schedules**.** The values contained in the schedules are those that the Debtors believe reflect the actual market value of the assets, should they be sold or auctioned in a liquidation scenario. These values are not book values based on purchase price as may be reflected elsewhere.

**b.   Summary of the Plan of Reorganization**

97.     Debtors shall, as Reorganized Debtors, continue to exist after the Effective Date as legal entities organized in their respective sate without any prejudice to any right to alter or terminate such existence under applicable state law.

98.     This Plan provides 100% payment to secured creditors per their terms or over a five (5) year period at 8% interest. The priority claims to the taxing authorities, if any, will also be paid in full on the Effective Date. They are estimated at $-0-. Unsecured creditors with claims of professional fees will be paid 100% of their claims in one single lump sum payment to be made within 180 days of the Effective Date. Other Unsecured Creditors will be paid pursuant to their terms or, in the absence of terms, 100% on terms provided to secured creditors.

**c.  Administrative and Priority Claims**

99.     In accordance with section 1123(a)(1) of the Bankruptcy Code, administrative expense claims and priority tax claims have not been classified and thus are excluded from the classes of claims and equity interests set forth in section (d) below. Administrative claims are the claims allowed under § 503(b) of the Bankruptcy Code for administration of these bankruptcy cases.

100.    All final requests for payment of professional fee claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 90 days after the Effective Date. Retained Professionals shall provide the Debtors with a reasonable and good faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date and shall provide such estimate no later than five Business Days prior to the anticipated Effective Date. If the Retained Professional does not provide an estimate, Debtors may estimate the amount of unpaid and unbilled fees and expenses. The total estimated amount shall

be deposited into the Retained Professional's trust account at least two Business Days prior to the Effective Date. The funds held in the trust account shall be the property of the estates of the Debtors or Reorganized Debtors. When all professional fee claims allowed by the Bankruptcy Court have been paid in full pursuant to one or more final orders of the Bankruptcy Court, any remaining funds held in trust shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other entity. Alternatively, under SBRA, the Debtors may propose annual installment payments over the three (3) year term of the Plan.

101.    Holders of Administrative Claims may include, without limitation, Wiley Law Group PLLC for professional fees in the estimated amount of $25,000.00 and the Subchapter V Trustee estimated at $5,000.00.

102.    After the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. The Reorganized Debtors may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court, should any services be rendered.

103.    All Statutory Fees that become due and payable prior to the Effective Date shall be paid by the Debtors within thirty (30) days after the Effective Date. After the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable and file any reports as applicable. The Reorganized Debtors shall remain obligated to pay the quarterly fees to the United States Trustee until the Chapter 11 cases are converted, dismissed, or a final decree is issued, whichever occurs first.

104.    Except to the extent that a holder of an Allowed Claim of the type described

in §507(a)(8) of the Bankruptcy Code has been paid prior to the Effective Date or agrees to a less

favorable treatment, in full and final satisfaction compromise, settlement, release, discharge of,

and in exchange for, each such Allowed Claim and each Holder of such Allowed Claim shall be

treated in accordance with the terms set forth in 1129(a)(9)(C) of the Bankruptcy Code and shall

receive annual Cash payments commencing on the first anniversary of the Effective Date to pay

the aggregate amount of such Claim within five years of the Petition Date. However, the Debtors

and Reorganized Debtors shall have the right to pay any such priority tax claim, or any remaining

balance, in full, at the time on or after the Effective Date, without premium or penalty. All priority

tax claims that are not due and payable on or before the Effective Date shall be paid in the ordinary

course of business as such obligations become due. The total estimated priority tax claims for

Debtors are $-0-.

### d.  Summary of Treatment of Claims and Equity Interests

### i.  Classification of Claims and Equity Interests (Claims are Consolidated for Both EarthSnap and Ralls).

| Class | Type | Status Under Plan | Treatment | Voting Status |
|---|---|---|---|---|
| 1 | Secured Claim – PlantSnap, Inc. | Unimpaired | Paid per terms of the Term Sheet | Not Applicable |
| 2 | Secured Claim – DEJ Partners, LLC | Unimpaired | Given cure of Term Sheet $-0- | Not Applicable |
| 3 | Secured Claim – Alley Bank | Unimpaired | Paid per terms | Not Applicable |
| 4 | Secured Claim – Brian Funk | Unimpaired | Paid per terms | Not Applicable |
| 5 | Peter W. Thomas | | Duplicate Claim | Not Applicable |
| 6 | Unsecured Claims – POC | Impaired | Paid 5 years in annual installments at 8% interest | Not Applicable |
| 7 | Unsecured Claims of Professionals | Unimpaired | N/A | Not Applicable |
| 8 | General Unsecured Claims | Unimpaired | Paid 5 years in | Not Applicable |

| 9 | Equity Interest of Debtor | Unimpaired | Retain Stock | Not Applicable |
|---|---|---|---|---|
| | | | annual installments at 8% interest | |

### ii. Treatment of Claims and Equity Interests

#### 1. Class 1: Secured Claim

105.     PlantSnap, Inc. will be paid its Allowed Secured Claim of $2.5 million per existing terms, of the Term Sheet for $2.5 million in payment of 100% of the estimated claim payment of $2.5 million to resolve the filed proof of claims which represents claims filed as follows

Claim 4-1 EarthSnap $2,565,205.48

Claim 6-1 Eric Ralls $2,599,175.95

#### 2. Class 2: Secured Claim

106.     DEJ Partners, LLC will be paid its Allowed Secured Claim per existing terms of the Term Sheet that provided a judgment only upon default, which the Plan will cure. The estimated payment to resolve 100% of the following claims is $-0-.

Claim 5-1 EarthSnap $1.5 million and

Claim 6-1 Eric Ralls. $3.434.9 million

#### 3. Class 3: Secured Claim

107.     Ally Bank will be paid its Allowed Secured Claim per existing terms.

Claim 9-1 Eric Ralls $265,778.36

#### 4. Class 4: Secured Claim

108.     Brian Funk will be paid the Allowed Secured Claim per existing terms.

Claim 9-1 Eric Ralls $265,778.36

#### 5. Class 5: Secured Claim

109.     Peter W. Thomas filed a mistaken proof of claim on behalf of either Plantsnap or

DEJ. The claim is therefore duplicative and is estimated at $0.

Claim 10-1 Eric Ralls $2,478,043.00

### 6. Class 6: Unsecured Claim

110.    The following unsecured claims will be paid its Allowed Unsecured Claim over

five (years) in annual installments at 8% interest, unless otherwise specified treatment:

- **a.**   Provectus IT, Inc.;

   Claim 1-1 EarthSnap $184,967.62

- **b.**   Amazon Web Services, Inc.;

   Claim 2-1 EarthSnap $267,441.81

- **c.**   Google, LLC;

   Claim 3-1 EarthSnap $205,365.00

- **d.**   HI Investment, LLC; Estimated at $0-0 since the retention of interest in 14% of

   Debtors exceeds the Claim. See Class 9 treatment.

   Claim 6-1 EarthSnap $1,248,000.00 and

   Claim 11-1 Eric $1,248,000.00

- **e.**   Discovery Bank;

   Claim 1-1 Eric Ralls $17,092.88

- **f.**   American Express National Bank;

   Claim 2-1 Eric Ralls $88,786.50 and

   Claim 3-1 Eric Ralls $60,618.88

- **g.**   JPMorgan Chase Bank, N.A. s/b/m/t Chase Bank USA, N.A.;

   Claim 4-1 Eric Ralls $8,278.13

- **h.**   Midland Credit Management, Inc.;

Claim 7-1 Eric Ralls $3,982.87

**i.** Bank of America N.A.; and

Claim 8-1 Eric Ralls $14,730.79

**j.** HI Investments, LLC;

Claim 11-1 Eric Ralls $1,248,000.00

### 7. Class 7: **Unsecured Creditors of Professionals**

111.    This class consists of all known non-priority unsecured claims of professionals rendering professional accounting, legal, or other services to the Debtors prior to the filing, whether scheduled or based on proofs of claim on file and some trade claims. There are none.

### 8. Class 8: General Unsecured Creditors – Scheduled but no POC.

**a.** Majestyk Contingent Disputed (EarthSnap Schedule Amount $54,500.00). To be amended and scheduled undisputed at $90,687.50. Paid on the same terms as Class 6.

**b.** Michael Melito (Eric Ralls Schedule Amount $26,620.50). Paid on the same terms as Class 6.

### 9. Class 9: Equity Interest of Eric Ralls and H1 Investment

112.    This class consists of the holders of the of equity interest. These claims will be satisfied by the retention of this interest. This class is non-voting as insiders.

### 6. Executory Contracts and Leases

113.    The Term Sheet will be assumed between the Debtors and PlantSnap with cure of defaults on the Effective Date and assumption of the balance of monthly obligations per existing terms by a separate motion to assume heard prior to Confirmation.

### 7. Claims Objections

114.    Claims objections must be filed no later than 60 days after the order confirming the Plan is entered. The Court, on motion by a party in interest, may extend the deadline. Any such motion must be filed no later than 60 days after the order confirming the plan is entered.

115.    Except for as otherwise provided herein or as agreed to by the Reorganized Debtors, all Proofs of Claim filed after the applicable claims bar date (regular claims and government) shall be deemed disallowed in full and expunged as of the Effective Date, forever barred, estopped, and enjoined from assertion.

116.    On or after the Effective Date, except as provided in the Plan of Confirmation Order, a Proof of Claim may not be amended without prior authorization of the Bankruptcy Court and the Reorganized Debtors. Any unauthorized amended Proof of Claim shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; provided that the foregoing shall not apply to Administrative Claims.

## 8. Confirmation Procedure

### a.    Hearing

117.    A hearing has been scheduled for _____.m. (Central Time), before the Honorable _____, 515 Rusk Street, Courtroom 404, Houston, Texas 77002, to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court.

### b.    Procedure for Objecting

118.    Any objection to confirmation of this Plan must: a) be in writing, b) conform to the applicable Bankruptcy Rules, c) be filed with the Bankruptcy Court and served so as to be actually received on or before _____("Confirmation Objection Deadline"), by (i) counsel for the Debtors, Kevin S. Wiley, Sr., Wiley Law Group, PLLC, 325 N. St. Paul, Ste., 2250, Dallas,

Texas 75201 and ii) the United States Trustee, 515 Rusk Ave, Ste. 3516, Houston, Texas 77002.

119. Unless an objection is timely filed and served by the Confirmation Objection Deadline, such objection may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### c. Requirements for Confirmation

120. The Bankruptcy Court will confirm the Plan only if it meets all applicable requirements of section 1129 of the Bankruptcy Code, as modified under SBRA. Among the requirements for confirmation is that the Plan be: a) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan distribute the equivalent of at least three years of disposable income, "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class under SBRA; and b) feasible. The Bankruptcy Court must also find that a) the Plan has classified Claims and Equity Interests in a permissible manner; b) the Plan complies with the other technical requirements of Chapter 11 of the Bankruptcy Code; and c) the Plan has been proposed in good faith. The Debtors believe that the Plan complies, or will comply, with all such requirements.

### d. Classification of Claims and Equity Interests

121. Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Plan creates separate Classes to deal respectively with the various claims and interests. The Debtors believe that the Plan's classifications place substantially similar Claims and Equity Interests in the same Class, and this meets the requirements of section 1122 of the Bankruptcy Code.

### e. Impaired Claims or Equity Interests

122.     Section 1124 of the Bankruptcy Code provides that a Class of Claims or Equity Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests. Holders of Claims or Equity Interests that are Impaired (except insiders under obsolete cramdown rules) are entitled to vote on the Plan. Holders of Claims that are not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. SBRA has rendered impairment or lack thereof in any event not relevant since consent of at least one impaired class is no longer required. Therefore, the significance of finding "impairment" or "insiders" is now immaterial.

### f.     Eligibility to Vote on the Plan

123.     Unless otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes 1, 2, 3,4, 5, and 6 may vote on the Plan. In order to vote on the Plan, you must hold a Claim in Classes 1-6. Debtors will only solicit votes from Holders of Claims that are entitled to vote. Again, the Plan may be confirmed whether or not you consent.

### g.     Voting Deadline

124.     The deadline to submit the voting ballot is_____.

125.     In order for the ballots to count, it must be complete and delivered timely to Kevin S. Wiley, Sr., Wiley Law Group, PLLC, 325 N. St. Paul, Ste., 2250, Dallas, Texas 75201. Any legible ballot that is timely received from a party entitled to vote, that contains sufficient information to permit the identification of the party casting the ballot, and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection. The form of the Ballot is attached as Exhibit I.

### h.     Acceptance of the Plan

126.     Prior to SBRA, in order for the Plan to be accepted by an Impaired Class of Claims,

a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. Also, prior to SBRA, at least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. Under SBRA, this requirement of at least one impaired class voting to accept the Plan is no longer required. Notwithstanding, the Debtors urge that you vote to accept the Plan since that greatly assists in the confirmation procedure on meeting the other requirements.

## 9. Provisions Governing Distributions

### a. Method of Payment

127.    Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or electronic wire.

### b. Distribution Agent

128.    The Reorganized Debtors may employ a Distribution Agent. Should the Reorganized Debtors employ a Distribution Agent, the Distribution Agent shall be empowered to a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; b) make all distributions contemplated under the Plan; c) employ professionals to represent it with respect to its responsibilities; and d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan. Reasonable fees and expenses incurred by the Distribution Agent after the Effective Date shall be paid by the Reorganized Debtors. The Distribution Agent shall not be required to give bond or surety or otherwise provide security for the performance of its duties unless ordered by the Bankruptcy Court.

### c.  Distributions

129.     Distributions shall be made to the Holders of Allowed Claims after the Effective Date a) to the address of each such Holder as set forth in the Debtors' Books and Records (or if the Debtors have been notified in writing, on or before the date that is 10 Business Days before the Effective Date, with a 30 day cure period, of a change of address, to the changed address) or in the Claims registers as of the date of the Confirmation Hearing or (b) on any counsel that has provided notice of representation or appeared in the Chapter 11 Cases on the Holders Behalf; provided that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in, as applicable, any Proof of Claim filed. If no Proof of Claim has been filed, then the address set forth in the Schedules. Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### d.   Rule for Disputed Claims

130.     Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtors and the Holder of a Disputed Claim, or as set forth in a final order, no partial payments and partial distributions should be made with respect to a Disputed Claim until the Disputed Claim has become an Allowed Claim, or has otherwise been resolved by settlement or final order.

### e.   Undeliverable Distributions and Unclaimed Property

131.     In the event that either (a) a distribution to any Holder is returned as undelivered or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until it has been determined that the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time the

distribution shall be made without interest or other accruals; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six months after the later of (a) the Effective Date and (v) the date of the distribution. After such date, all unclaimed property of interests in property shall revert to the Reorganized Debtors automatically and without a need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

### f. Effect of Confirmation of the Plan

132.     Except as provided in this Plan, the occurrence of the Effective Date of this Plan shall, and does hereby, act to discharge and release the Claims of all creditors of all interests against the Debtors and the Reorganized Debtors and shall be deemed to constitute a full and complete settlement with such creditors. The Plan constitutes, unless excluded by Order of this Court based on exception to discharge, complete satisfaction, discharge, and release of all claims, causes of action of any nature whatsoever, including any interest accrued on claims of from and after the Petition Date, whether known or unknown, against, liabilities, liens on, obligations of, and rights against the Debtors or any of their assets, regardless of whether any of their assets shall have been distributed or retained pursuant to the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the occurrence of the Effective Date.

133.     Confirmation of the Plan, however, shall not disturb the perfected liens on any class of secured creditors as provided for in this Plan. With respect to the classes of secured creditors holding a secured claim, such creditors shall retain their lien(s) securing such claims until such a time that the secured claim is satisfied.

### g. United States Trustee Fees

134. None.

### h. Miscellaneous Provisions

### a. Binding Effect

135. The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims and Holders of Equity Interests, and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### b. Headings

136. Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan.

### c. Termination of Injunctions or Stays

137. Unless otherwise provided herein or in another order from the Bankruptcy Court, all injunctions or stays provided for in these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date shall terminate on the Effective Date, at which time the injunctions and stays set forth in this Plan shall take effect. Provided, however, the Confirmation of the Plan shall constitute an injunction against any action by any party that seeks to interfere with the Plan directly or indirectly. This Court retains exclusive jurisdiction in that regard, pursuant to authority granted under 11 U.S.C. §105 et seq.

### d. Amendment or Modification of the Plan

138. Alterations, amendments, or modifications of the Plan may be proposed in writing by the Debtors at any time before the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code

and the Debtors have complied with sections 1125 of the Bankruptcy Code. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder. Prior to the Effective Date, the Debtors may make appropriate technical non-material modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the treatment of holders of Claims or Equity Interests.

### e.  Severability

139.    In the event the Bankruptcy Court determines, before the Confirmation Date, that any provisions in this Plan are invalid, void, or unenforceable, such provision shall be invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void, or unenforceable. The invalidity, voidability, or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan and shall not require re-solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

### f.  Revocation or Withdrawal of the Combined Plan and Disclosure Statement

140.    The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claim by or against the Debtor and the Estate.

### g.  Exhibits and Schedules

141.    All exhibits and schedules to the Plan are incorporated into and are a part of the

Plan as if set forth in full herein.

### h. No Admissions

142.    Notwithstanding anything herein to the contrary, nothing contained in the Plan shall

be deemed as an admission by any Entity with respect to any matter set forth herein.

### i. Successors and Assigns

143.    The rights, benefits, and obligations of any Person or Entity named or referred to

in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator,

successor, or assign of such Person or Entity.

### j. Implementation

144.    The Debtors and Reorganized Debtors, as applicable, shall take all steps and

execute all documents necessary to effectuate the provisions contained in this Plan.

### k. Inconsistency

145.    In the event of any inconsistency among the Plan and any other instrument or

document created or executed pursuant to the Plan, the provisions of the Plan shall govern.


Dated: January 16th, 2024.                    Respectfully submitted,

                                              WILEY LAW GROUP, PLLC

                                              */s/ KEVIN S. WILEY, SR.*
                                              KEVIN S. WILEY, SR.
                                              Texas Bar No.: 21470700
                                              325 N. ST. PAUL, SUITE 2250
                                              DALLAS, TEXAS 75201
                                              T: (214) 537-9572
                                              F: (972) 298-8717
                                              kwiley@wileylawgroup.com
                                              **Counsel for the Debtors**

| Earth.com Revenues | | | |
|---|---|---|---|
| Date | Net Revenue | Formula | Gross Revenue |
| 2024 September | $274,352.96 | C4*12%+C4 | $307,275.32 |
| 2024 October | $214,384.34 | C5*12%+C5 | $240,110.46 |
| 2024 November | $270,718.66 | C6*12%+C6 | $303,204.90 |
| 2024 December | $458,247.34 | C7*12%+C7 | $513,237.02 |
| **Average:** | **$304,425.83** | **Total:** | **$1,363,827.70** |

**Average:**       $304,425.83

| Year | Formula | Total | (=) | Formula | Total |
|---|---|---|---|---|---|
| Y1 | Y1 @ + 10% | $334,868.41 | $4,018,209.00 | I4+J4 | $4,353,077.41 |
| Y2 | Y2 @ 10% + | $340,956.92 | $4,420,038.00 | I5+J5 | $4,760,994.92 |
| Y3 | Y3 @ 10% + | $340,956.92 | $4,892,047.00 | I6+J6 | $5,233,003.92 |
| **Total** | | **$1,016,782.26** | | **Total** | **$14,347,076.26** |

# EX A











Earth.com

Eric ▸

Dashboard
Health Check
Videos
Playlists
Payments
Settings ▸
Grow
Uplift
Switch Sites ▸

**Revenue**
Custom Range:
Jul 1, 2024 - Jul 31, 2024

Custom ▾ | Compare Last Period ▾

Copy Link | Sessions | Payments

Ad Block Recovery

| | Revenue | Sessions | RPM |
|---|---|---|---|
| | $68,981.56 | 3,279,877 | $21.03 |

**Credits**

| Date ▴ | Description ▴ | Amount ▴ |
|---|---|---|
| Jul 25, 2024 | April Blockheld Distribution | $5.25 |

**Earnings & RPM**

Earnings

Custom Range: Jul 1, 2024 - Jul 31, 2024
● Earnings  ● Sessions

$7.2K
$5.4K
$3.6K
$1.8K
$2.0K

100K
25K
70K
73K
42.4K

RPM

Custom Range: Jul 1, 2024 - Jul 31, 2024
● RPM  ● Sessions

$30
$20
$10
$5.4

42.4K
73K
75K
100K



## EXHIBIT B

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of January 16, 2025 (as amended, supplemented, or otherwise modified, this "Support Agreement" or "Plan Support") as contemplated by the Plan of Reorganization (the "Plan"). This agreement is annexed as Exhibit "B" to the Plan and Disclosure Statement filed of even date therewith, which effectuates the restructuring of the Debtor's liabilities to creditors (the "Restructuring." Each party to this Support Agreement may be referred to as a "Party" and, collectively, as the "Parties."

## Section 1. Restructuring.

### 1.1. Support of the Restructuring

(a) Under the terms of the Plan, the Plan Supporters shall make each and every plan payment required to be made by the Debtor to all classes of creditors under the Plan as described in the Disclosure Statement as follows:

b) Plan Supporters agree: (i) to take any and all necessary and appropriate actions in furtherance of the Restructuring contemplated under this Support Agreement, (ii) to assist in the solicitation for acceptances of the Plan in accordance with the terms of this Support Agreement (the "Solicitation"); (iii) assist in seeking approval of the Disclosure Statement and confirmation of the Plan, (iv) to take any and all necessary and appropriate actions in furtherance of all of the restructuring transactions contemplated under this Support Agreement.

(c) Each of the Parties agrees, severally and not jointly, that, unless this Support Agreement is terminated in accordance with the terms hereof, and except with respect to the exercise of its rights hereunder, it will not take any action that would interfere with, delay, or postpone the effectuation of the Restructuring contemplated by this Support Agreement and the Term Sheet and, if necessary, confirmation and consummation of the Plan and implementation of the restructuring transactions contemplated thereunder.

## Section 2. Termination Events.

### 2.1. Plan Supporter Termination Events.

The occurrence of any of the following shall be a "Plan Supporter Termination Event":

(a) any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Term Sheet or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company subject to the reasonable satisfaction of the Steering Committee;

(b) Reserved

(c) Reserved

(d) Reserved

1

**2.2**. **Consensual Termination.**

Reserved.

**2.6**. **Limitation on Termination.**

No occurrence shall constitute a Termination Event if such occurrence is the result of the action or omission of the Party seeking to terminate this Support Agreement. Moreover, once the Plan is confirmed by a final, non-appealable order, no termination event will result in the termination of this Agreement, and the Plan Supporters shall be irrevocably bound under its terms.

**Section 3**. **Condition Precedent to Support Agreement.**

The obligations of the Parties and the effectiveness hereof are subject to the execution and delivery of signature pages for this Support Agreement by each of (a) the Debtor and (b) the Plan Supporters and the entry of a final, non-appealable order of confirmation, and if appealed, no stay is provided including the injunctive provisions as presently constituted in the Plan and otherwise materially comporting with the Plan.

**Section 4**. **Representations, Warranties, and Covenants.**

**4.1**. **Power and Authority.**
Each Party, severally and not jointly, represents, warrants, and covenants to the other that, as of the date of this Support Agreement, (i) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to carry out the transactions contemplated by, and perform its respective obligations under this Support Agreement and (ii) the execution and delivery of this Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2**. **Enforceability.**

Each Party, severally and not jointly, represents, warrants, and covenants to the other, jointly and severally, represent, warrant and covenant to the other, that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**Section 6**. **Remedies.**

It is understood and agreed by each of the Parties that any breach of this Support Agreement by a Plan Support Party would give rise to irreparable harm to the other for which monetary damages would not be an adequate remedy and accordingly, the Parties agree that, in addition to any other remedies, the Debtor and Plan Supporters shall be entitled to specific performance and injunctive or other equitable relief for any such breach.

**Section 7**. **Acknowledgments.**

2

(a)  This Support Agreement and the Plan and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

**Section 8**. **Miscellaneous Terms.**

**8.1**. <u>**Assignment; Transfer Restrictions**</u>**. This agreement is non-assignable by any Party.**

**8.2**. <u>**No Third-Party Beneficiaries**</u>**.**

Unless expressly stated herein, this Support Agreement shall be solely for the benefit of the Debtor and the Plan Supporters. No other person or entity shall be a third-party beneficiary.

**8.3**. <u>**Entire Agreement**</u>**.**

This Support Agreement, annexed as Exhibit B to the Disclosure Statement and the Plan, constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersede all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement and the Plan.

**8.4**. <u>**Counterparts**</u>**.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Support Agreement by email or facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

**8.5**. <u>**Settlement Discussions**</u>**.**

This Support Agreement is part of a proposed settlement of disputes among the Parties hereto. Nothing herein shall be deemed to be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement or in connection with the confirmation of the Plan.

**8.6**. <u>**Governing Law; Waiver of Jury Trial**</u>**.**

(a)  The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties arising out of this Support Agreement, whether sounding in contract, tort, or otherwise.

(b)  This Support Agreement shall be governed by and construed in accordance with the laws of the State of Texas and, under the Chapter 11 Case, the Bankruptcy Code, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction. By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself (i) that, subject to Section 8.6(c) hereof, any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for

3

recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction Tarrant County, Texas, (ii) that it consents to the personal jurisdiction of the Bankruptcy Court in connection with the Chapter 11 Case, and (iii) by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings, including the Chapter 11 Case.

(c)    Notwithstanding the foregoing, nothing in subsections 8.6(a) or (b) hereof shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Support Agreement.

## 8.8. **Successors.**

This Support Agreement is intended to bind the Parties and inures to the benefit of the Restructuring Support Parties and the Debtor and each of their respective successors, assigns, heirs, executors, administrators, and representatives.

## 8.9. **Nature of Obligations.**

Notwithstanding anything to the contrary herein, any obligations of the Restructuring Support Parties contained herein are several in nature and not joint obligations.

## 8.10. **Acknowledgment of Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the transactions contemplated by this Support Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Support Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto. No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

## 8.11. **Amendments, Modifications, Waivers.**

(a) This Support Agreement (including, without limitation, the Term Sheet) may only be modified, amended, or supplemented, and any of the terms thereof may only be waived by an agreement in writing signed by each of the Parties hereto.

## 8.12. **Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal, or unenforceable in any respect, that provision shall not affect the validity, legality, or enforceability of any other provision of this Support Agreement.

## 8.13. **Notices.**

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the applicable addresses set forth below; or (b) sent by facsimile transmission or email to the parties listed below with a confirmatory copy

delivered by overnight courier.

IN WITNESS WHEREOF, the parties hereto have caused this Support Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

By: ERIC RALLS

_____
Title: Debtor


By: EARTHSNAP, INC.

_____
Title: Debtor

PLAN SUPPORTERS:

DIGITAL EARTH MEDIA, INC,


By:_____
Its Authorized Officer


EARTH COM, INC.


By:_____
Its Authorized Officer


METAVERSAL KNOWLEDGE, INC.


By:_____
Its Authorized Officer



GREENMIND, LLC


By:_____
Its Authorized Officer