> **EXHIBIT O**

### DIGITAL EARTH MEDIA INC.

## STOCKHOLDERS' AGREEMENT

**THIS STOCKHOLDERS' AGREEMENT** (the "**Agreement**") is dated February 15, 2022 (the "**Effective Date**"), among **DIGITAL EARTH MEDIA INC.**, a Delaware corporation (the "**Company**") those holders of the Company's Preferred Stock (as defined below) listed on **Schedule 1** hereto (the "**Investors**"), and those holders of the Company's Common Stock (as defined below) listed on **Schedule 2** hereto (the "**Common Holders**" and, together with the Investors, the "**Stockholders**").   Capitalized terms used but not defined herein shall have the meanings assigned to them in the Company's Certificate of Incorporation, as in effect from time to time (the "**Charter**").

### RECITALS

**WHEREAS,** the Common Holders are the beneficial owners of shares of the Company's common stock par value $0.001 per share ("**Common Stock**"), as listed on **Schedule 2**;

**WHEREAS,** the Investors are purchasing shares of the Company's Series Seed Preferred Stock, par value $0.001 per share (the "**Preferred Stock**") pursuant to one or more Series Seed Preferred Stock Subscription Agreements (the "**Subscription Agreements**");

**WHEREAS,** the obligations in the Subscription Agreements are conditioned upon the execution and delivery of this Agreement; and

**WHEREAS,** as an inducement to the Investors to purchase the Company's Preferred Stock pursuant to the Subscription Agreements, the Stockholders and the Company desire to enter into this Agreement to provide for certain rights concerning shares of the Company's capital stock as set forth herein;

### AGREEMENT

**NOW THEREFORE,** in consideration of the foregoing premises, the representations, warranties, and covenants contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **CERTAIN DEFINITIONS.**

"**Affiliate**" means, with respect to any Person, another Person who, directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

"**Asset Sale**" means a sale, lease, or other disposition of all or substantially all of the Company's or its subsidiaries assets, determined on a consolidated basis, directly or indirectly, other than to a direct or indirect wholly-owned subsidiary of the Company

"**Change in Control**" means any corporate transaction (including any reorganization, consolidation, or merger of the Company with or into any other entity) or any sale, exchange, or other disposition of the Company's Equity Securities (other than a sale by the Company of its Equity Securities for the primary purpose of raising capital for its operations and activities) in which the Company's stockholders immediately prior to such corporate transaction, sale, exchange, or disposition own less than a majority of the voting power of the surviving entity immediately after such corporate transaction, sale, exchange, or disposition.

"**Equity Securities**" means (a) any Common Stock, Preferred Stock, or other security of the Company, (b) any security convertible into or exercisable or exchangeable for, with or without consideration, any Common Stock, Preferred Stock, or other security of the Company (including any option to purchase such a convertible security), (c) any security carrying any warrant or right to subscribe to or purchase any Common Stock, Preferred Stock, or other security of the Company, or (d) any such warrant or right.

"**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

"**Liquidation**" means the liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary.

"**Person**" means any individual, firm, corporation, partnership, association, limited liability company, trust or any other entity.

"**Shares**" means collectively, shares of the Company's Common Stock and Preferred Stock now owned or subsequently acquired by a Stockholder.

"**Transfer**" means any sale, assignment, pledge, encumbrance, hypothecation, pledge, exchange, transfer (including by request, devise, or descent), conveyance in trust, gift, grant of any option to purchase, hedging or similar transaction with the same economic effect as a sale of, or other disposition of any interest of any kind in, any Shares whether voluntary or by operation of law, directly or indirectly, including, but not limited to, transfers of Shares to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors.

Other capitalized terms used but not defined herein shall have the meanings assigned to them in Charter.

## 2.  RESTRICTION ON SALE OR TRANSFER.

**2.1    General.**  In addition to any other restrictions on transfer set forth in the Company's bylaws ("**Bylaws**") or any other Agreement to which a Stockholder is a party or to which any Shares are subject, each Stockholder agrees not to Transfer all or any portion of their Shares unless and until:

(a)    There is then in effect a registration statement under the Securities Act of 1933, as amended (the "**Securities Act**"), or other applicable law covering such proposed Transfer and such Transfer is made in accordance with such registration statement; or

(b)      (i) The transferee has agreed in writing to be bound by the terms of this Agreement, (ii) such Stockholder has notified the Company of the proposed Transfer and has furnished the Company with a detailed statement of the circumstances surrounding the proposed Transfer, (iii) such Transfer is made in accordance with the provisions of the Company's Bylaws, and (iv) if reasonably requested by the Company, such Stockholder has furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such Transfer will not require registration of such shares under the Securities Act.  Notwithstanding the foregoing, except in unusual circumstances, the Company will not require opinions of counsel for transactions made pursuant to Rule 144 under the Securities Act or for any of the following (each, a "**Permitted Transfer**"):

(i)      any Transfer without consideration by an individual Stockholder to such Stockholder's ancestors, descendants, spouse, or to trusts for the benefit of such persons or such Stockholder;

(ii)      a corporate Stockholder's Transfer of any or all of its Shares to any or all of its stockholders;

(iii)      a corporate Stockholder's Transfer of any or all of its Shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of shares, or capital reorganization of the corporate Stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate Stockholder;

(iv)      a Transfer by a Stockholder that is a limited or general partnership to any or all of its partners or former partners;

(v)      a Transfer by a Stockholder that is a limited liability company to any or all of its members or former members; or

(vi)      a Transfer by a Stockholder that is a trust to any or all of its beneficiaries or former beneficiaries.

**2.2**      **Market Standoff**.  Each Stockholder further agrees to not Transfer (including making any short sale of) any Common Stock or other securities of the Company held by Purchaser, including the Shares (the "**Restricted Securities**"), during the 180-day period following the effective date of a registration statement under the Securities Act covering such Restricted Securities, or such longer period (not to exceed 18 days after the expiration of the 180-day period, as the underwriters or the Company shall request in order to facilitate compliance with FINRA Rule 2241) (the "**Lock-Up Period**").  Each Stockholder agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter that are consistent with the foregoing or that are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to any Stockholder's Restricted Securities until the end of the Lock-Up Period. The underwriters of the Restricted Securities are intended third party beneficiaries of this **Section 2.2** and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto.

**2.3** **No Company Obligations.** The Company shall not be required (a) to transfer on its books any Shares purported to have been sold or Transferred in violation of any of the provisions set forth in this Agreement or the Company's Bylaws or (b) to treat as the owner of such Shares or to accord the right to vote or to pay dividends to any transferee to whom such Shares shall have been so Transferred.

**2.4** **Legends.**

(a)    Each certificate representing Shares shall be stamped or otherwise imprinted with legends substantially similar to the following restrictive legend (in addition to any legend required under applicable state securities laws) (each, a "**Legend**"):

> "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND MAY NOT BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO (A) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR (B) AN EXEMPTION FROM REGISTRATION UNDER THE ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE ACT AND SUCH OTHER APPLICABLE LAWS."

(b)    In addition to any Legend required by **Section 2.4(a)**, each certificate representing shares of Common Stock shall be stamped or otherwise imprinted with Legends substantially similar to the following Legends (in addition to any legend required under applicable state securities laws):

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS' AGREEMENT BETWEEN THE STOCKHOLDER AND THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY."

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY OR THE COMPANY'S ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE COMPANY."

**3.** **VOTING AND BOARD COMPOSITION.**

**3.1** **Voting Agreement.** Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in accordance with, the provisions of this Agreement.

**3.2    Size of the Board.** Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the board of directors of the Company (the "**Board**") shall be set and remain at two directors, which number may be increased with the written consent of the holders of at least a majority of the Shares, including the consent of the Required Investors.

**3.3    Board Composition**. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Board:

(a)    One individual designated by HI Investments, LLC, who shall initially be Vernon Decossas.

(b)    One individual designated by the holders of a majority of the shares of Common Stock then outstanding, who shall initially be Eric Ralls.

**3.4    Failure to Designate a Board Member**. In the absence of any designation from the Persons or groups with the right to designate a director as specified above, the director previously designated by them and then serving shall be reelected if still eligible to serve as provided herein.

**3.5    Removal of Board Members**. Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

(a)    no director elected pursuant to **Section 3.3** or **Section 3.4** of this Agreement may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person(s) entitled under **Section 3.3** to designate that director; or (ii) the Person(s) originally entitled to designate or approve such director pursuant to **Section 3.3** is no longer so entitled to designate or approve such director;

(b)    any vacancies created by the resignation, removal or death of a director elected pursuant to **Section 3.3** or **Section 3.4** shall be filled pursuant to the provisions of this **Section 3**; and

(c)    upon the request of any party entitled to designate a director as provided in **Section 3.3** to remove such director, such director shall be removed.

All Stockholders agree to execute any written consents required to perform the obligations of this Agreement, and the Company agrees at the request of any party entitled to designate directors to call a special meeting of stockholders for the purpose of electing directors.

**3.6    No Liability for Election of Recommended Director.** None of the parties hereto and no officer, director, stockholder, partner, employee, or agent of any party makes any representation or warranty as to the fitness or competence of any director to serve on the Board by

virtue of such party's execution of this Agreement or by the act of such party in voting for such director pursuant to this Agreement.

**3.7    No "Bad Actor" Designees.**  Each Stockholder with the right to designate or participate in the designation of a director as specified above hereby represents and warrants to the Company that, to such Stockholder's knowledge, none of the "bad actor" disqualifying events described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act (each, a "**Disqualification Event**"), is applicable to such Stockholder's initial designee named above, *except*, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.  Any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable, is hereinafter referred to as a "**Disqualified Designee**".  Each Stockholder with the right to designate or participate in the designation of a director as specified above hereby covenants and agrees (a) not to designate or participate in the designation of any director designee who, to such Stockholder's knowledge, is a Disqualified Designee and (b) that in the event such Stockholder becomes aware that any individual previously designated by any such Stockholder is or has become a Disqualified Designee, such Stockholder shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee.

**3.8    Irrevocable Proxy.**  To secure each Stockholder's obligations to vote such Stockholder's Shares in accordance with this Agreement, including without limitation **Section 3** and **Section 4**, each Stockholder hereby appoints the Chairman of the Board, the Chief Executive of the Company, or the Secretary of the Company, or any of them from time to time, or their designees, as such Stockholder's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, to vote all of such Stockholder's Shares as set forth in this Agreement, and to execute all appropriate instruments consistent with this Agreement on behalf of such Stockholder if such Stockholder fails to vote all of such Stockholder's Shares as required by this Agreement or fails to execute such other instruments reasonably necessary to give effect to this Agreement, in either case within five days of the Company's or any other party's written request for such Stockholder's written consent or signature.  The proxy and power granted by each Stockholder pursuant to this section are coupled with an interest and are given to secure the performance of such party's duties under this Agreement.  Each such proxy and power will be irrevocable for the term hereof.  The proxy and power, so long as any party hereto is an individual, will survive the death, incompetency, or disability of such party or any other individual holder of the Shares and, so long as any party hereto is an entity, will survive the merger or reorganization of such party or any other entity holding any of such party's Shares.

**4.    COVENANTS OF THE COMPANY.**

**4.1    Assignment of Right of First Refusal.**  The Company's Bylaws shall contain a right of first refusal of the Company on all Transfers of Common Stock, to purchase all, of the Common Stock proposed to be Transferred, subject to customary exceptions.  If the Company elects not to exercise its right thereunder with respect to any Stockholder within 10 days of such right becoming exercisable by the Company, the Company shall promptly assign its right to the other Stockholders on a *pro rata* basis.  In the event of such assignment, each other Stockholder shall have a right to purchase that portion of the securities proposed to be Transferred by such

Stockholder equal to the ratio of (a) the number of shares of the Company's Common Stock (including shares issued or issuable upon conversion of the shares of Preferred Stock) owned by such other Stockholder, to (b) the number of shares of Common Stock (including Common Stock issued or issuable upon conversion of the shares of Preferred Stock) owned by all other Stockholders.

### 4.2    Preemptive Rights.

(a)    **Preemptive Rights**.  In the event that the Company proposes to offer or sell any Equity Securities ("**New Securities**") in a *bona fide* third-party offering or sale, then subject to applicable securities laws, each Investor that is an accredited investor within the meaning of Regulation D under the Securities Act (an "**Accredited Investor**") shall have a preemptive right to purchase up to its *pro rata* share of all New Securities that the Company may, from time to time, propose to sell and issue after the date such Investor becomes a party to this Agreement, other than the New Securities excluded by **Section 4.2(e)** hereof.  As used in this **Section 4.2**, each such Investor's *pro rata* share is equal to the ratio of (i) the number of shares of the Company's Common Stock (including all shares of Common Stock issuable or issued upon conversion of the Company's Preferred Stock or upon the exercise of outstanding warrants or options) of which such Investor is deemed to be a holder immediately prior to the issuance of the New Securities to (ii) the total number of shares of the Company's outstanding Common Stock (including all shares of Common Stock issued or issuable upon conversion of the Company's Preferred Stock or upon the exercise of any outstanding warrants or options) immediately prior to the issuance of the New Securities.

(b)    **Exercise of Rights**.  If the Company proposes to issue any New Securities, it shall give each Investor written notice of its intention, describing the New Securities, the price and the terms and conditions upon which the Company proposes to issue such New Securities. Each Investor shall have 15 days from the giving of such notice to agree to purchase up to its *pro rata* share of the New Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the number of New Securities to be purchased.  Such written notice given to the Company shall also include evidence reasonably satisfactory to the Company that the Investor giving the notice will be an Accredited Investor at the time of consummation of the proposed sale.  Notwithstanding the foregoing, the Company shall not be required to offer or sell such New Securities to any Investor who would cause the Company to be in violation of applicable state or federal securities laws by virtue of such offer or sale or who is not an Accredited Investor at the time of such sale.

(c)    **Sale Without Notice**.  In lieu of giving notice to the Investors prior to the issuance of New Securities as provided in **Section 4.2(b)**, the Company may elect to give notice to the Investor within 30 days after the issuance of New Securities.  Such notice shall describe the New Securities, the price and the terms and conditions upon which the Company proposes to issue such New Securities. Each Investor shall have 20 days from the giving of such notice to agree to purchase up to its *pro rata* share of the New Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the number of New Securities to be purchased.  Such written notice given to the Company shall also include evidence reasonably satisfactory to the Company that the Investor giving the notice will be an Accredited Investor at the time of consummation of the proposed sale.  The closing of such

sale shall occur within 60 days of the date of notice to the Investors.  Notwithstanding the foregoing, the Company shall not be required to offer or sell such New Securities to any Investor who would cause the Company to be in violation of applicable state or federal securities laws by virtue of such offer or sale or who is not an Accredited Investor at the time of such sale.

(d)        **Assignment of Preemptive Rights**.  The preemptive rights of each Investor under this **Section 4.2** may be assigned by an Investor to a transferee or assignee of such Investor's Shares that (i) is a subsidiary, parent, general partner, limited partner, retired partner, member or retired member, or stockholder of an Investor that is a corporation, partnership, or limited liability company; (ii) is an Investor's immediate family member or trust for the benefit of an individual Investor; or (iii) acquires all of the Shares held by such Investor; *provided, however*, (A) the transferor shall, within 10 days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee, and (B) such transferee shall agree in writing to be subject to all restrictions set forth in this Agreement.

(e)        **Excluded Securities**.  The preemptive rights established by this **Section 4.2** shall have no application to any of the following Equity Securities ("**Excluded Securities**"):

(i)        shares of Common Stock issued or to be issued after the Effective Date to employees, officers, or directors of, or consultants or advisors to, the Company or any subsidiary of the Company, pursuant to stock purchase or stock option plans or other arrangements that are approved by the Board, including the affirmative vote of the Preferred Director;

(ii)       shares of stock issued or issuable pursuant to any rights or agreements, options, warrants, or convertible securities outstanding as of the Effective Date; and shares of stock issued pursuant to any such rights or agreements, options, warrants, or convertible securities granted after the Effective Date, so long as the preemptive rights established by this **Section 4.2** were complied with, waived, or were inapplicable pursuant to any provision of this **Section 4.2(e)** with respect to the initial sale or grant by the Company of such rights or agreements, options, warrants, or convertible securities;

(iii)      any Equity Securities issued for consideration other than cash pursuant to a merger, consolidation, acquisition, or similar business combination approved by the Board, including the affirmative vote of the Preferred Director;

(iv)      any Equity Securities issued in connection with any stock split, stock dividend, or recapitalization by the Company approved by the Board, including the affirmative vote of the Preferred Director;

(v)       any Equity Securities issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement, or debt financing from a bank, or similar financial or lending institution approved by the Board, including the affirmative vote of the Preferred Director;

(vi)      any Equity Securities that are issued by the Company pursuant to a registration statement filed under the Securities Act;

(vii)   any Equity Securities issued in connection with strategic transactions involving the Company and other entities, including (A) joint ventures, manufacturing, marketing or distribution arrangements; or (B) technology transfer or development arrangements; *provided that* the issuance of shares therein has been approved by the Board, including the affirmative vote of the Preferred Director;

(viii)   any Equity Securities issued by the Company pursuant to the Subscription Agreements; and

(ix)   any issuance of Equity Securities approved by the Board and the Required Investors (as defined in **Section 6**).

(f)   **Termination of Preemptive Rights.**  Without limiting **Section 6**, the rights and obligations established by this **Section 4.2** shall terminate upon an IPO.

**4.3   Consulting Agreement.**   The Company and HI Investments, LLC ("**HI Investments**") agree to negotiate in good faith a consulting agreement regarding the advertising relationship between the Company and HI Investments, LLC. Such agreement shall provide that HI Investments, LLC shall receive up to $750,000 in the aggregate of Monthly Advertising Profit generated from qualifying customers referred to the Company by HI Investments. For purposes of such agreement, "**Monthly Advertising Profit**" shall equal 75% of the Company's advertising revenue each month, *less* $content and marketing costs.

**5.   REPRESENTATIONS AND WARRANTIES.**   Each Stockholder represents and warrants that (a) such Stockholder owns the Shares set forth on **Schedule 1** and **Schedule 2**, as applicable, free and clear of liens or encumbrances, and has not, prior to or on the Effective Date, executed or delivered any proxy or entered into any other voting agreement or similar arrangement other than one which has expired or terminated prior to the date hereof, and (b) such Stockholder has full power and capacity to execute, deliver and perform this Agreement, which has been duly executed and delivered by, and evidences a valid and binding obligation of, such Stockholder enforceable in accordance with its terms.

**6.   TERMINATION.**   This Agreement shall continue in full force and effect from the Effective Date through the earliest of the following events, on which date it shall terminate in its entirety:

(a)   an Asset Sale;

(b)   a Change in Control;

(c)   a Liquidation;

(d)   the closing of an IPO;

(e)   the date as of which the parties hereto terminate this Agreement by written consent of each of (i) the Company (ii) the Required Common Holders; and (iii) the Required Investors.

As used in this agreement, "**Required Common Holders**" means the holders of a majority of the shares of Common Stock held by all of the Stockholders, and "**Required Investors**" means the Investors holding a majority of the shares of Preferred Stock held by all of the Investors.

7.      GENERAL.

7.1     **Additional Stockholders.**  Prior to the issuance of additional shares of Common Stock to any party who would hold more than one percent (1%) of the outstanding capital stock of the Company following such issuance, the Company shall require, as a condition to such party's receipt of such shares of Common Stock, that such party become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement and shall be deemed a Stockholder and a party hereunder.

7.2     **Additional Shares.**  In the event that subsequent to the date of this Agreement any shares or other securities are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, combination of shares, reclassification or the like, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

7.3     **Aggregation of Stock.**  All shares held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

7.4     **Adjustments.**  Wherever in this Agreement there is a reference to a specific number of shares of stock of any class or series, then, upon the occurrence of any subdivision, combination, or stock dividend or the like of such class or series of stock, the specific number of shares so referenced in this Agreement shall automatically be proportionally adjusted to reflect the effect on the outstanding shares of such class or series of stock by such subdivision, combination, or stock dividend or the like.

7.5     **Governing Law.**  This Agreement and any claim (whether in contract, tort or otherwise) or other matter arising out of or relating to this Agreement or the transactions contemplated hereby or thereby shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law principle or rule (whether of the State of Delaware or any other jurisdiction).

7.6     **Severability.**  If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable ("**Invalid**") in any jurisdiction, then such term or provision will be interpreted in such jurisdiction so as to accomplish its objectives to the greatest extent possible under applicable law; *provided*, that the Invalid term or provision will not affect any other term or provision of this Agreement or cause the term or provision to be Invalid in any other jurisdiction.

7.7     **Notices.**  All notices required or permitted by this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the recipient; (b) when sent by confirmed facsimile or electronic mail during normal business hours of the recipient, and if not sent during normal business hours of the recipient, then on the next business day; (c) five calendar days after having been sent by registered or certified mail, with return receipt requested and postage prepaid; or (d) one business day after deposit with a nationally recognized overnight

10

courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company, at:

> Digital Earth Media Inc.
> 473 West Colorado Ave
> Telluride, CO 81435-3740
> Email: ralls@earth.com
> Attn: Eric Ralls

and to each Stockholder at the address set forth on **Schedule 1 or Schedule 2**, as applicable, or to such other address or to the attention of such other person as the recipient has specified by 10 days' prior written notice to the sender.

**7.8     Amendment and Modification; Waiver.**  This Agreement may be amended, modified, or terminated only upon the written consent of (a) the Company; and (b) the Required Investors.  No waiver of any provision of this Agreement is effective unless it is in writing, identified as a waiver to this Agreement, and is signed by the party waiving its right (for the avoidance of doubt, by the Company, by the Required Investors on behalf of all of the Investors, or by any Stockholder individually).  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial waiver or exercise of any right, remedy, power, or privilege hereunder preclude or limit any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  Upon any amendment, modification, termination, or waiver by the Stockholders in accordance with this **Section 7.8** without a Stockholder's individual consent, the Company shall promptly give written notice thereof to such Stockholder. Notwithstanding the foregoing:

(a)     **Schedule 1** and **Schedule 2** hereto may be amended by the Company from time to time to add information regarding additional Investors and additional Common Holders, without the consent of the other parties hereto;

(b)     solely as to an amendment of or modification of this Agreement that, by its terms, adversely affects a Stockholder in a manner different from all other Stockholder, the consent of such Stockholder shall also be required;

(c)     solely as to an amendment of or modification of this Agreement that, by its terms, adversely affects the Common Holders in a manner different from the Investors, the consent of the holders of a majority of the issued and outstanding Common Stock held by the Common Holders shall also be required;

(d)     solely as to an amendment of or modification of **Section 3**, including, without limitation, **Section 3.3(a)** or this **Section 7.8(d),** the consent of HI Investments, LLC shall also be required; and

(e)     any provision of this Agreement may be waived by the waiving party on such party's own behalf, without the consent of any other party.

**7.9** **Successors and Assigns.** Except as otherwise expressly provided herein, and subject to the restrictions on transfer set forth herein, this Agreement shall inure to the benefit of and be binding upon the parties' respective permitted successors and permitted assigns. Any attempted assignment or delegation in violation of this Agreement shall be void and without effect.

**7.10** **Specific Performance.** The parties hereto hereby declare that it is impossible to measure in money the damages which will accrue to a party hereto or to their heirs, personal representatives, or assigns by reason of a failure to perform any of the obligations under this Agreement and agree that the terms of this Agreement shall be specifically enforceable. If any party hereto or his heirs, personal representatives, or assigns institutes any action or proceeding to specifically enforce the provisions hereof, any person against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such personal representative has an adequate remedy at law, and such person shall not offer in any such action or proceeding the claim or defense that such remedy at law exists.

**7.11** **Attorney's Fees.** In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs, and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs, and expenses of appeals.

**7.12** **Entire Agreement.** This Agreement, the exhibits, schedules, and attachments hereto and thereto, and the agreements expressly referenced herein and therein, each of which is incorporated herein, collectively constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede and merge all prior and contemporaneous agreements, understandings, or representations, whether written or oral.

**7.13** **Interpretation.** The headings used in this Agreement are for informational purposes and convenience only and in no way define, limit, construe, or describe the scope of the sections. Unless the context otherwise requires, (a) each term stated in either the singular or the plural shall include the singular and the plural, (b) the words "herein," "hereof," or any variation thereof refer to this Agreement as a whole and not merely to any subdivision hereof, and (c) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any preceding general statement. The parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arise, no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**7.14** **Counterparts; Electronic Delivery.** This Agreement may be executed in one or more counterpart(s), each of which shall be deemed an original and all of which shall be deemed one and the same instrument. Delivery of an executed counterpart to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this **STOCKHOLDERS' AGREEMENT** as of the Effective Date.

COMPANY:

DIGITAL EARTH MEDIA INC.

By: _Eric Ralls_____

Name: Eric Ralls

Title: President

IN WITNESS WHEREOF, the undersigned have executed this STOCKHOLDERS' AGREEMENT as of the Effective Date.

STOCKHOLDER:

HI INVESTMENTS, LLC

By: _____

Name: Vernon Decossas

Title: Manager

SIGNATURE PAGE TO DIGITAL EARTH MEDIA INC. STOCKHOLDERS' AGREEMENT

**IN WITNESS WHEREOF**, the undersigned have executed this **STOCKHOLDERS' AGREEMENT** as of the Effective Date.

**STOCKHOLDER:**

**ERIC RALLS**

*Eric Ralls*
5A622D1FBC804B7...

**COSMIN LUP**

*Cosmin Lup*
B24D22A8C89E4D0...

**ALEXANDRU DINDEAL**

*Alexandru Dindeal*
AEF9D1196E1B409...

## SCHEDULE 1

## INVESTORS

| STOCKHOLDER | ADDRESS | SERIES SEED PREFERRED SHARES |
|---|---|---|
| HI Investments, LLC | 1315 Oakfield Drive, Suite 2817, Brandon, FL 33509 | 916,667 |

2702232v.1

## SCHEDULE 2

## COMMON HOLDERS

| STOCKHOLDER | ADDRESS | COMMON SHARES |
|---|---|---|
| Eric Ralls | 473 West Colorado Ave. Telluride, CO 81435 | 8,178,571 |
| Cosmin Lup | Dacia 62, Oradea, Bihor, Romania 410339 | 35,714 |
| Alexandru Dindeal | Calugareni 10, Oradea, Bihor, Romania 410403 | 35,714 |

2702232v.1