Gregory W. Mitchell
THE MITCHELL LAW FIRM, L.P.
1100 W. Campbell, Suite 200
Richardson, TX  75080
(972)463-8417 – Office
(972)432-7540 – Facsimile
State Bar ID:  00791285
COUNSEL FOR DEBTOR

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 24-60504 |
| | § | |
| **Eric Ralls** | § | |
| | § | **Chapter 7 (converted from** |
| *Debtor* | § | **chapter 11)** |

## DEBTOR'S OBJECTION TO PROOF OF CLAIM NO. 10
## FILED BY DEJ PARTNERS, LLC

**NO HEARING WILL BE CONDUCTED ON THIS OBJECTION TO CLAIM UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 110 NORTH COLLEGE AVE., 9TH FLOOR, TYLER, TEXAS  75702 BEFORE CLOSE OF BUSINESS ON MARCH 3, 2026, WHICH IS AT LEAST 30 DAYS FROM THE DATE OF SERVICE HEREOF, AND SERVED UPON THE PARTY FILING THIS PLEADING UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH RESPONSE.  IF NO RESPONSE IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT.  IF A RESPONSE IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING.  THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW ERIC RALLS ("**Debtor**") to file his Objection to Proof of Claim No. 10 (the "**Objection**") filed by DEJ Partners, LLC ("**DEJP**" or "**Alleged Creditor**") pursuant to 11 §U.S.C. 502(b)(1) and Bankruptcy Rule 3007, and as grounds therefore would respectfully show the Court, as follows:

---

## I.  SUMMARY OF ARGUMENT

**1.**       Debtor objects to the characterization of Alleged Creditor's claim in the amount of $2,478,043.00 as a secured claim.  A copy of Alleged Creditor's Proof of Claim (No. 10) is attached as **Exhibit L.**

2.       Debtor does not object to the existence of an unsecured claim in favor of Alleged Creditor.  However, such claim is established by judgment, not by the so-called "Binding Term Sheet."

3.       Debtor objects to Alleged Creditor's claim to the extent that it purportedly arises from an agreement (the "**Binding Term Sheet**") that is nothing more than an "Agreement to Agree."

## II.  STATEMENT OF ISSUES TO BE DECIDED

4.       By this Objection, Debtor seeks judgment as a matter of law that Alleged Creditor has nothing more than an unsecured claim against Debtor in Debtor's bankruptcy case.

5.       Alternatively, Debtor seeks judgment as a matter of law on one or more of the following discrete issues:

(1) That the so-called "Binding Term Sheet" contains one or more conditions precedent that have not been satisfied.

(2) That, as a result of one or more conditions precedent to the formation of a contract not having been satisfied, the "Binding Term Sheet" is not a valid contract.

(3) That, to the extent the "Binding Term Sheet" is not a valid contract, Alleged Creditor has no secured claim against Debtor.

(4) That, to the extent that the "Binding Term Sheet" rises to the level of a valid contract, as a result of one or more conditions precedent to Debtor's performance not having been satisfied, Debtor has no duty to perform under the Binding Term Sheet.

(5) That, as a matter of applicable law, a security interest in certificated stock requires physical possession of such stock.

(6) That it is an undisputed material fact that Alleged Creditor never obtained physical possession of Debtor's stock in Digital Earth Media.

(7) That, as a result of Alleged Creditor never having obtained physical possession of Debtor's stock in Digital Earth Media, Alleged Creditor has no security interest in such stock.

(8) That, as a result of Alleged Creditor's lack of a security interest in Debtor's stock in Digital Earh Media, Alleged Creditor's claim against Debtor is an unsecured claim only.

(9) That Debtor has standing to object.

## III.  EVIDENTIARY SUPPORT FOR THE OBJECTION

6.    In support of this Objection, Debtor references the following evidence, compiled in the

Appendix attached to this Objection and filed contemporaneously herewith and incorporated herein by

reference:

(1)   Exhibit A:  Binding Term Sheet (2024-02-19;
(2)   Exhibit B:  DEJP Judgment (2024-03-04);
(3)   Exhibit C:  DEJP Attorneys' Fees Judgment (2024-03-04);
(4)   Exhibit D:  E-mail history from February 10, 2024, to August 14, 2024;
(5)   Exhibit E:  Status Report filed in Case No. 2021CV030005, Combined Court, San Miguel County, Colorado, on May 17, 2024;
(6)   Exhibit F:  Settlement Agreement draft as of June 4, 2024;
(7)   Exhibit G:  Pledge Agreement draft as of June 4, 2024;
(8)   Exhibit H:  Promissory Note draft as of June 4, 2024;
(9)   Exhibit I:  Order Following Status Conference dated June 27, 2024;
(10)  Exhibit J:  Confession of Judgment (2024-07-31) (Exh. 1-2 to POC #6);
(11)  Exhibit K:  Docket sheet for Case No. 24-60504 as of December 29, 2025;
(12)  Exhibit L:  Proof of Claim No. 6 filed by Plantsnap, Inc.;
(13)  Exhibit M: Quist Valuation of Earth.com, Inc. (prepared August 20, 2025);
(14)  Exhibit N:  Debtor's Bankruptcy Schedules;
(15)  Exhibit O:  DEM Stockholders' Agreement;
(16)  Exhibit P:  Affidavit of Anas Elmadhum; and
(17)  Exhibit Q:  Declaration of Robert Kitsmiller;

## IV.    STATEMENT OF UNDISPUTED MATERIAL FACTS

7.    On March 17, 2021, Alleged Creditor initiated an action against Debtor before the District

Court for San Miguel County, Colorado in the case styled, *PlantSnap Inc. v. Ralls*, No. 2021CV30005 (Colo.

Dist. Ct. San Miguel Cty. Mar. 17, 2021) (the **State Court Action**").

8.      On February 19, 2024, Debtor and DEJP executed a term sheet (the "**Binding Term Sheet**").  The Binding Term Sheet contemplates several actions/events, including but not limited to the following:

(1)  The creation and execution of a "Secured Promissory Note" (*see* ¶4 therein);

(2)  The transfer of certain certificated shares of stock (denominated the "Pledged Shares") into escrow (¶4.B. therein);

(3)  The execution by Debtor of a blank stock power to DEJP (¶4.B. therein);

(4)  Designation of an independent agent agreeable to both parties that would hold the Pledged Shares in escrow (¶4.B. therein); and

(5)  The formulation by Debtor and DEJP of escrow instructions to be provided to the escrow agent (¶4.B. therein).

(6)  The creation and execution of a finalized settlement agreement ([the first][1]¶8 therein);

(7)  The creation and execution of global releases (¶9 therein); and

(8)  The creation and execution of other "finalized agreements" that include warranties and representations described in [the second] ¶8 therein.

A copy of the Binding Term Sheet is attached hereto as **<u>Exhibit A</u>**.

9.      On March 4, 2024, the Colorado Court in the State Court Action entered an order granting final judgment against Debtor in favor of Alleged Creditor in the amount of $978,043.23 (the "**DEJP Judgment**").  A copy of the DEJP Judgment is attached hereto as **<u>Exhibit B</u>**.

10.     Also on March 4, 2024, the Colorado Court in the State Court Action entered an order granting final judgment for attorneys' fees against the Debtor in favor of Alleged Creditor in the amount of $63,856.35 (the "**Attorneys' Fees Judgment**").  A copy of the Attorneys' Fees Judgment is attached hereto as **<u>Exhibit C</u>**.

---

[1] The Binding Term Sheet – presumably inadvertently – contains two paragraphs numbered "8."  If necessary, they will be referred to herein as "[the first] ¶8" or "[the second] ¶8".

11.     Between February 10, 2024, and August 14, 2024, Debtor and DEJP, through Counsel, engaged in extensive back-and-forth negotiations regarding the actions and events contemplated by the Binding Term Sheet.  Email communications to that effect are attached hereto as **Exhibit D**.

12.     The email communications included in Exhibit D reveal the following regarding the status of the actions and events contemplated by the Binding Term Sheet:

➔ On March 22, 2024, Dean Richardson first circulates "Draft Settlement Documents" [RALLS018];

➔ On April 3, 2024, Dean Richardson follows up from his initial email from the previous week [RALLS019];

➔ That same day (April 3, 2024), Bob Kitsmiller responds that he will be working with the Debtor to get this turned around [RALLS021];

➔ On April 11, 2024, Dean Richardson follows up [RALLS023];

➔ That same day (April 11, 2024), Michael Melito responds that a review has started and that "we'll get back to you by Monday" [RALLS025];

➔ On April 15, 2024, Peter Thomas reaches out to check on status [RALLS027];

➔ Mr. Melito responds later that day (April 15, 2024) saying that "we have comments and will call shortly" [RALLS029];

➔ That same day (April 15, 2024), Peter Thomas indicates that Dean Richardson is "jammed up the next few days" [RALLS031];

➔ On April 16, 2024, Dean Richardson communicates that he is "underwater with training for the next day or so" [RALLS034];

➔ On April 18, 2024, Peter Thomas circulates questions raised by Greg Stites (Truist, the prospective escrow agent) [RALLS037-38];

➔ On April 22, 2024, Peter Thomas reaches out to Truist to get clarification on some of the questions raised by the escrow agent regarding delivery of physical stock certificates [RALLS043];

➔ On April 23, 2024, Bob Kitsmiller sends initial red-lines of the settlement documents [RALLS048];

➔ That same day (April 23, 2024), Peter Thomas acknowledges receipt of drafts of

settlement documents [RALLS049];

➔ Two days later, on April 25, 2024, Dean Richardson reaches out to say that they will be getting with their clients to discuss – "probably next week" [RALLS050];

➔ On April 30, 2024, Dean Richardson communicates saying, "I can get you edits to the agreements, but thought I would start by raising some concerns . . ." [RALLS051]. Therein, Mr. Richardson references: (1) 3 bullet points with respect to the Pledge Agreement; (2) 1 bullet point with respect to the Promissory Note; and (3) 5 bullet points with respect to the Settlement agreement [RALLS051-52];

➔ On May 2, 2024, Peter Thomas reaches out to see if there is any feedback. In that email, Mr. Thomas says "Let's get this buttoned up and signed" [RALLS053];

➔ Later that day (May 2, 2024), Bob Kitsmiller responds that "We are speaking with our client tomorrow" [RALLS056];

➔ That same day (May 2, 2024), Peter Thomas responds back with "Sounds good, thank you." [RALLS058];

➔ That same day (May 2, 2024), Dean Richardson reaches out again to raise an additional point/concern [RALLS062];

➔ On May 3, 2024, Bob Kitsmiller emails explaining to the opposing side an issue that he has become aware of regarding a family emergency of Eric Ralls involving his brother [RALLS065];

➔ That same day (May 3, 2024), Dean Richardson responds, "Thanks, Bob. Have a good weekend." [RALLS068];

➔ Later that day (May 3, 2024), Dean Richardson follows up to point out that the first payment pursuant to the Binding Term Sheet is due on Tuesday, May 7, 2024 [RALLS071];

➔ On May 6, 2024, Mike Melito responds emphasizing the fact that the payment **"is not meant to signal that we have arrived at a final agreement to the terms that we are still currently negotiating. The payments to your clients are being made in good faith to live up to the expectations laid out in the payment schedule. That said, we are still preserving all rights of Eric's and the entities as we continue to wind through the negotiations with you and your respective clients."** [RALLS076]**;**

➔ On May 8, 2024, Peter Thomas follows up regarding questions from the "potential escrow agent" and the delivery of "physical stock certificates" [RALLS079];

➔ The same day (May 8, 2024), Bob Kitsmiller responds reiterating Debtor's issues with

health and family [RALLS083];

➔ The same day (May 8, 2024), Dean Richardson responds "Of course – family first" [RALLS088];

➔ The same day (May 8, 2024), Peter Thomas reiterates the need for answers to questions from the Escrow Agent [RALLS092];

➔ On May 10, 2024, Mr. Thomas again raises issues regarding the escrow agent questions [RALLS097];

➔ That same day (May 10, 2024), Mr. Melito responds to Mr. Richardson's message regarding traveling; he also points out that he will be out of the country from May 22 – June 14) [RALLS103-104];

➔ The same day (May 10, 2024), Dean Richardson acknowledges Mr. Melito's message [RALLS106];

➔ On May 16, 2024, Mr. Melito follows up to explain ongoing issues related to client's personal issues and unavailability [RALLS115];

➔ On May 29, 2024, Dean Richardson follows up, pointing out that a court deadline is coming up [RALLS120];

➔ On May 30, 2024, Mr. Melito responds reminding that he's out of the country until June 14, 2024 [RALLS123];

➔ On May 30, 2024, Bob Kitsmiller reports that he has a call scheduled "tomorrow afternoon with Eric" [RALLS129];

➔ On May 31, 2024, Bob Kitsmiller reaches out to ask for a call on Monday with Dean Richardson and Peter Thomas to "finalize the docs" [RALLS134];

➔ The same day (May 31, 2024), Mr. Richardson reports that he will "be around Monday" [RALLS138];

➔ The same day (May 31, 2024), Mr. Richardson follows up again that he's available "any time after 10:00" on Monday [RALLS144];

➔ The same day (May 31, 2024), Mr. Thomas confirms he's available on Monday after 11:45 a.m. [RALLS150];

➔ On June 3, 2024, Mr. Thomas circulates red-lined settlement documents [RALLS161];

➔ On June 7, 2024, Dean Richardson circulates revised versions of settlement documents, apparently pursuant to the discussions on the call.  [RALLS162]

   o  NOTE: The attachments to this message are attached hereto as **Exhibits F, G and H**

➔ After several communications regarding monetary default beginning June 10, 2024 [RALLS163-174], on June 18, 2024, discussions regarding settlement documents are resurrected in which parties are hoping to address before status conference with the Court [RALLS175];

➔ On June 21, 2024, Peter Thomas resurrects discussion regarding getting escrow questions answered [RALLS178];

➔ On June 27, 2024, Mr. Thomas inquires with Bob Kitsmiller following a court hearing regarding information still needed, including questions about delivery of stock certificates [RALLS185];

➔ On same day (June 27, 2024), Mr. Richardson requests "current asset schedule" pursuant to Binding Term Sheets [RALLS192];

➔ On June 28, 2024, Mr. Kitsmiller responds that he's not aware of any "asset schedules" [RALLS203];

➔ On July 2, 2024, Mr. Thomas follows up again regarding the issues related to the escrow agent [RALLS205];

➔ The same day (July 2, 2024), Mr. Kitsmiller responds informing Mr. Thomas that "it is a physical certificate" [RALLS212];

➔ On July 2, 2024, Mr. Thomas acknowledges Mr. Kitsmiller's response and asks about finalizing Escrow instructions and if there are any further revisions. [RALLS220];

➔ On July 8, 2024, Mr. Richardson inquires about settlement documents with the goal of "push[ing] this forward before we are in front of the court" [RALLS228];

➔ On July 10, 2024, Mr. Richardson serves notice of monetary default [RALLS237];

➔ On August 14, 2024, Mr. Richardson serves on Mr. Melito a writ of execution ordering his firm to turn over Mr. Ralls' DEM shares to the extent Mr. Melito's firm is in possession of them [RALLS240].

13.     In the midst of the above communications, on May 17, 2024, Dean Richardson filed a *Status Report and Request for Status Conference* (the "**Status Report**") with the Colorado Court in the State Court Action. A copy of the Status Report is attached hereto as **Exhibit E**.

14.     The Status Report provided to the court lays out the numerous issues remaining to be resolved, including a reference to "nine points" that remain unaddressed. *See* Exh. E, at ¶6 therein. The issues addressed in the Status Report had not been resolved when the Debtor filed this bankruptcy case. *See* Exhibit Q, at ¶6.

15.     Exhibits F, G, and H, represent draft documents attached to Mr. Richardson's June 7, 2024, email, including drafts of:

> (1)  The "Settlement Agreement and Release" (**Exhibit F**);
> (2)  The "Pledge Agreement" (**Exhibit G**); and
> (3)  The "Promissory Note" (**Exhibit H**).[2]

16.     On June 27, 2024, the Colorado Court in the State Court Action entered its *Order Following Status Conference*, pursuant to which the Court acknowledged that:

> [t]he parties are still working to execute the terms of a binding settlement agreement between them. One major outstanding issue includes the placement of Mr. Ralls' shares into escrow, which has been prolonged.

A copy of the *Order Following Status Conference* is attached hereto as **Exhibit I**.

17.     On July 31, 2024, the Colorado Court in the State Court Action entered the Confession of Judgment, recognizing the stipulated judgment against the Debtor in favor of Alleged Creditor in the amount of $1,500,000.00 (the "**Confession of Judgment**"). A copy of the Confession of Judgment is attached hereto as **Exhibit J**.

18.     On August 18, 2024, Debtor filed this bankruptcy case. A copy of the Court's docket of this matter as of December 29, 2025, is attached hereto as **Exhibit K**.

19.     On or about October 28, 2024, Alleged Creditor filed its Proof of Claim No. 10. Then, on or about July 3, 2025, Alleged Creditor filed its Amended Proof of Claim No. 10, a copy of which is

---

[2] Exhibit F, G and H are drafts of agreements between Debtor and Plantsnap. No such drafts had even been circulated with respect to DEJP.

attached hereto as **Exhibit L**.

## V.     ARGUMENT AND AUTHORITIES

### A.   DEJP Has an Unsecured Claim

20.     Debtor does not dispute that Alleged Creditor has a claim.  That claim is based on the judgments referenced hereinabove, *i.e.*, the Attorneys' Fees Judgment, the DEJP Judgment, and the Confession of Judgment – all described hereinabove.  Indeed, in its POC No. 10, DEJP explicitly acknowledges that the basis of its claim is "Judgments against Debtor for contract breach and attorney fees." *See* Exh. L, at §8.

21.     Judgments are universally considered unsecured debts at the time they are rendered.  A judgment alone does not create a lien or secured interest in property; additional steps must be taken under applicable law to convert an unsecured judgment debt into a secured claim.  *See, e.g., In re Quade*, 482 B.R. 217, 226 (Bankr. N.D. Ill., 2012) (". . . A judgment, in and of itself, does not elevate the debt within the judgment to a secured status; something more is needed. . . ."); *see also In re Brengle*, 10 B.R. 360, 361-62 (Bankr. D. Delaware, 1981) (same).

### B.   A Security Interest in Certificated Stock Requires Physical Possession of the Stock; DEJP Does Not, Nor Did it Ever, Have Physical Possession of Debtor's DEM Stock

22.     The question becomes, what is the "something more" that is needed to convert an unsecured debt into a secured debt (*i.e.*, create a "perfected security interest")?

23.     In the State of Colorado, the answer to that question is clear.  When the property on which a creditor seeks a lien is certificated stock, the only way to perfect a security interest in that stock is to take physical possession of the stock certificates.[3]

---

[3] At the preliminary hearing on this matter, the Court cited the parties to *Great Plains National Bank, N.A. v. Mount*, 280 P.3d 670 (Col. Court of Appeals, Div. VI, 2012), which analyzed a security interest in cattle (not certificated securities).  That case focused on a provision of the Food Security Act of 1985 (FSA) that looked at where cattle were "produced in" for purposes of determining whether an out of state purchaser took cattle subject to a security interest created in Oklahoma.  It was

24.     Pursuant to Colorado Statute, C.R.S. § 4-9-313(a), in order to perfect a security interest in certificated securities, a secured party must take delivery of the certificated securities. *See also Moreland v. Alpert*, 124 P.3d 896 (Col. Court of Appeals, Div. V, 2005); *Securities Investor Protection Corp. v. First Entertainment Holding Corp.*, 36 P.3d 175 (Col. Court of Appeals, Div. I, 2001).

25.     Debtor's equity interest in DEM is a security. *See* C.R.S. 4-8-103(a).

26.     Pursuant to C.R.S. 4-8-102(4), a "Certificated Security" is a security that is represented by a certificate.

27.     Delivery of a certificated security occurs when a party acquires physical possession of the security certificate. *See* C.R.S. 4-8-301(a)(1).

28.     Applied to the case at bar, it is undisputed that Alleged Creditor never took physical possession of Debtor's DEM stock certificates.

29.     C.R.S. § 4-9-203 addresses the issue of when a security interest attaches to collateral. Section 4-9-203(b)(3)(C) specifically addresses the issue of when a security interest attaches to a "certificated security in registered form," and it plainly requires that "the security certificate has been delivered to the secured party under 4-8-301 pursuant to the debtor's security agreement."

30.     In turn, C.R.S. § 4-8-301(a) addresses the issue of "delivery," providing that:

(a)  Delivery of a certificated security to a purchaser occurs when:

---

undisputed in that case that security interests were granted; the issue was whether or not the buyer could take the cattle free of the security interest pursuant to the FSA. Therefore, *Great Plains* has limited applicability to the case at bar.

This Court also referenced *In re Estate of Wheeler*, 410 P.3d 483 (Col. Court of Appeals, Div. I, 2013) at the preliminary hearing on this matter. In that case, a Colorado court found that a lease agreement reasonably identified secured collateral as all of tenant's personal property at tenant's jewelry store, and therefore the lease created an enforceable security interest. Critically, once again this case does not deal with certificated securities, which by statute – C.R.S. 4-9-313(a) – requires physical possession on the part of a secured party in order for there to be a perfected security interest. Additionally, there was no dispute in that case that the tenant granted the lien on its personal property. Therefore, the lease itself was the security agreement. Here, the Binding Term Sheet made specific reference to a subsequent secured promissory note (an "agreement to agree") that was never executed. Analogous facts would have been if the lease contemplated the subsequent negotiation and execution of a security agreement pursuant to which the landlord would take a security interest in tenant's property, but that is not what occurred. Therefore, Debtor once again respectfully suggests that *In re Estate of Wheeler* is not controlling in the case at bar.

(1) The purchaser acquires possession of the security certificate;

(2) Another person, other than a securities intermediary, either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser; or

(3) A securities intermediary acting on behalf of the purchaser acquires possession of the security certificate, only if the certificate is in registered form and is (i) registered in the name of the purchaser, (ii) payable to the order of the purchaser, or (iii) specially indorsed to the purchaser by an effective indorsement and has not been indorsed to the securities intermediary or in blank.

31.     It is undisputed in this case that delivery of Debtor's certificated security in Digital Earth Media never occurred.  It was clearly contemplated based on the discussions noted above, but it never occurred.

32.     The language of C.R.S. § 4-9-203(b)(3)(C) makes clear that a security agreement is insufficient.  The security certificate must be "delivered to the secured party. . . pursuant to the security agreement."

33.     Therefore, even if DEJP could establish that a security agreement had been signed (which, as will be seen, *infra*, it cannot), that would be insufficient.  Because once again, the certificated stock must have been actually delivered to DEJP or an intermediary who acquired possession of the security certificate on behalf of DEJP.  Neither of those occurred.

34.     The email communications described hereinabove make apparent that the parties were working toward an agreement by which Debtor would transfer his certificated shares to Truist in escrow.  Such a transfer would likely have satisfied C.R.S. § 4-8-301(a)(2) as a transfer to an intermediary who acquired possession of the security certificate on behalf of DEJP.  But plans to deliver at a future time plainly do not satisfy the statutory requirement of possession.

### C.  No Security Agreement was Ever Executed

35.     As described above, a security interest in certificated stock requires that "the security certificate has been delivered to the secured party under 4-8-301 pursuant to the debtor's security agreement." C.R.S. C.R.S. § 4-9-203(b)(3)(C).

36.     The lack of delivery as described above can and should be the end of the analysis.

37.     However, DEJP has made the argument[4] – clearly an incorrect legal argument pursuant to the analysis above – that a security agreement alone can satisfy the requirements for perfecting a security interest in certificated stock.

38.     Unfortunately, even if that dubious legal argument had merit, it could not prevail because no security agreement was ever executed.

39.     DEJP apparently contends that it perfected a security interest by way of a security interest it purportedly obtained in the DEM Shares as a result of the "Binding Term Sheet". However, although the Binding Term Sheet contemplates the creation of a Secured Promissory Note, it is once again undisputed that no such document exists. Quite to the contrary, it is clear that, as of June 7, 2024, the parties were still negotiating the terms of various agreements – including a settlement agreement (Exhibit F), a pledge agreement (Exhibit G), and a promissory note (Exhibit H).[5]

40.     The negotiations reveal a classic "agreement to agree" that never materialized. Query how a so-called "binding" term sheet could be truly binding if documents required by the Binding Term Sheet to be executed were not actually executed. Although it is unnecessary for the Court to reach this conclusion for purposes of the Motion, the so-called Binding Term Sheets were just that – agreements to agree that required further negotiations and agreements that never materialized.

---

[4] It is unclear whether DEJP has ever explicitly taken this position. However, DEJP has consistently joined in the arguments presented by Plantsnap, a similarly situated creditor. Upon information and belief, DEJP asserts the same argument.

[5] As noted, *supra*, in FN2, Exhibits F, G and H are drafts of agreements between Debtor and Plantsnap. No such drafts had even been circulated with respect to DEJP. *See* Exhibit Q, *Declaration of Robert Kitsmiller*, at ¶7.

41.     "There can be no binding contract if it appears that further negotiations are required to work out important and essential terms."  *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Col. Court of Appeals, Div. IV, 2001); *Griffin v. Griffin*, 699 P.2d 407 (Colo. 1985) (Agreements to agree in the future are generally unenforceable because the court cannot force parties to come to an agreement); *Am. Mining Co. v. Himrod-Kimball Mines Co.*, 124 Colo. 186, 235 P.2d 804 (1951) (there can be no binding contract if it appears that further negotiations are required to work out important and essential terms).

42.     Additionally, the Binding Terms Sheet contemplated an "Intercreditor Agreement" designed to "to ensure that the Ralls Entities do not have conflicting duties to DEJP and Plantsnap." This was an important concern for the Debtor, and unlike the other agreements referenced above, there was not even a draft of an Intercreditor Agreement that was circulated.  Therefore, a substantial material agreement affecting the Debtor's rights had not yet even been drafted.

43.     Although DEJP apparently filed UCC financing statements, the lack of a security agreement renders any such UCC filings meaningless.  It is black letter law that a security interest doesn't exist without a security agreement.  A UCC filing does not create a security interest if there is no security agreement.

44.     The UCC establishes that a security interest (in personal property that is non-certificated securities) attaches when three conditions are met:

    (1)  the debtor has signed a security agreement containing a description of the collateral;

    (2)  there is consideration; and

    (3)  the debtor has obtained rights in the collateral.

*In re Payless Cashways, Inc.*, 273 B.R. 789 (Bankr. W.D. Missouri, 2002).

45.     A financing statement merely serves as public notice of a creditor's claim to a security interest but does not itself create or enforce the interest. *See In re Flores De New Mexico, Inc.*, 151 B.R. 571

(Bankr. D. New Mexico, 1993); *In re Legal Cooperatives, Inc.* 5 B.R. 382 (Bankr. S.D. Tex., 1980).

46.     The Binding Term Sheet contemplates a security agreement, but as clearly reflected in the analysis above, when the parties proceeded to attempt to negotiate the terms of such a security agreement, they could not reach agreement.  As a result, no security interest was ever granted.  DEJP would have this court manufacture a security interest out of thin air.

47.     When confronted with these misrepresentations, counsel for Plantsnap[6] responded:

> Ralls refused to execute a promissory note or reduce the binding term sheet to a written agreement.  Nevertheless, under Colorado law, the binding term sheet is a contract between the parties, which PlantSnap is now enforcing.  I would also note that Ralls made payments pursuant to the very section he is now claiming does not exist.

Plantsnap supplemented this response:

> The binding term sheet is an enforceable contract; the fact that Ralls refused to finalize the settlement documents (including the note) is irrelevant, because the terms of the agreement are sufficiently definite. *See McCarthy v. Kent*, No. 23CA1907, 2024 Colo. App. LEXIS 1862, at *5–6 (Colo. App. Sept. 12, 2024).

Unfortunately, both responses miss the point.  While certain legal principles may support the existence of a contract,[7] such principles do not create a security interest.  The parties may have performed in a manner consistent with the Binding Term Sheet, but that, too, does not create a security interest.  The Binding Term Sheet itself may be "sufficiently definite," but the contemplated "Secured Promissory Note" simply does not exist.

48.     Once again, as noted above, it is unnecessary to reach an analysis of the existence of a security agreement because a security agreement alone is insufficient to perfect a security interest in

---

[6] Once again, while counsel for DEJP has not explicitly made similar arguments, it presumably joins in those arguments.

[7] Debtor contends that the failure by the parties to reach agreement on the terms of the contemplated Secured Promissory Note renders the Binding Term Sheet unenforceable and void based on the critical nature of the security agreement in the overall scope of the agreement between the parties.  Note, however, that this does not affect the existence of Plantsnap's claim.  To the extent the Binding Term Sheet retains any validity, it is simply an agreement related to its claim against the Debtor – which exists as a result of judgments.

certificated securities.  But the analysis above makes further clear that no security agreement existed in any event.

### D. Debtor Has Standing to Object

49.     Alleged Creditor has asserted that the Debtor lacks standing to object to Alleged Creditor's claim based on his status as a chapter 7 debtor.

50.     It is generally true that chapter 7 debtors do not have standing to object to claims or orders relating to them because these debtors typically lack any pecuniary interest in the trustee's disposition of property of the estate, since title to such property no longer resides in the debtor.  *See, e.g., Schiano v. Salkin*, 2019 WL 3997129, at *4 (S.D. Fla. 2019).

51.     However, a well-settled exception to this principle exists where there is a possible pecuniary impact on the debtor.  *See, e.g., In re Vosotas*, 666 B.R. 684, 690 (Bankr. S.D. Fla., 2025).

52.     In *Vosotas*, that pecuniary impact was found to exist where a settlement agreement – with respect to which the debtor therein sought to object – adversely impacted the debtor's defenses in a non-dischargeability action.

53.     Other cases have found that a debtor is an interested party where the debtor's estate is solvent and there is a likelihood of a surplus distribution to the debtor.  *See, e.g., In re Ebel*, 338 B.R. 862, 874 (Bankr. D. Colorado, 2005).

54.     In this case, the Debtor's estate holds 84% of the stock of DEM, which in turn owns 100% of Earth.com, Inc. – a company which very recently was valued at almost $18 million.  *See* **Exhibit M**, *Valuation of Earth.com, Inc. Prepared by Quist Valuation*, dated August 20, 2025, along with **Exhibit P**, the *Affidavit of Anas Elmadhun* attesting to the authenticity of the valuation.

55.     Debtor's bankruptcy schedules reflect total liabilities in the amount of $5,306,940.50.

| Part 2: | Summarize Your Liabilities | | |
|---|---|---|---|
| | | **Your liabilities** Amount you owe | |
| 2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D) 2a. Copy the total you listed in Column A, *Amount of claim*, at the bottom of the last page of Part 1 of *Schedule D*....... | | | $27,500.00 |
| 3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F) 3a. Copy the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F*................................. | | | $0.00 |
| 3b. Copy the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F*................................. | | + | $5,279,440.50 |
| | **Your total liabilities** | | $5,306,940.50 |

*See* Debtor's Bankruptcy Schedules (Conversion schedules filed on November 18, 2025), a copy of which is attached hereto as **Exhibit N**.

56.    Debtor therefore establishes the existence of a likely surplus distribution and therefore has standing to object.

## VI. CONCLUSION

### A. DEJP Has a Claim, But Not A Secured Claim

57.    Debtor does not dispute that DEJP holds a claim arising from the Colorado judgments and related orders. Absent a valid lien, however, a judgment creditor is an unsecured creditor. The issue here is not whether DEJP has a debt, but rather, whether DEJP has established a consensual security interest (or other lien) in the Pledged Shares that existed as of the petition date and is enforceable against the estate.  DEJP's proof of claim and supporting papers do not meet that burden.

### B. The Term Sheet and DEJP's Own Admissions Show the Consensual Lien Never Attached

58.    The Term Sheet describes a future closing – a secured not plus escrow delivery of certificated shares.

59.    The Term Sheet does not say DEJP already possesses the Pledged Shares, already holds an executed secured note, or already has a completed pledge.  Instead, it requires later future acts: the Ralls Parties "shall execute and deliver" a "Secured Promissory Note," and the certificated shares are to

be placed into escrow with a mutually agreed agent, with escrow instructions still to be formulated, and with a blank stock power executed contemporaneously with escrow delivery. Those are operative implementation steps—not mere formalities.

**C. State Court Filing Confirmed the Definitive Documents were Still Being Negotiated and Not Completed.**

60.     In its May 17, 2024, Status Report filed in the State Court Action, counsel for PlantSnap represented to the Colorado Court that the settlement involved "numerous, and somewhat complex, documents," that PlantSnap and DEJP drafted and provided those documents on March 22, 2024, that defense counsel returned redlines on April 23, 2024, and that PlantSnap and DEJP responded on April 30, 2024 seeking additional input/discussion on unresolved points. That filing is a straightforward admission—by PlantSnap and DEJP—that the deal paperwork implementing the alleged pledge had not been finalized.

**D. The Record Confirms the Decisive Closing Events Never Occurred.**

61.     Technically, the Court need not decide abstract questions about whether the Term Sheet is "binding" in some contractual sense, as even a binding term sheet is not proof that a security interest attached to collateral.  Here, the contemplated secured promissory note was never executed and never delivered in final form.

62.     There is, quite clearly, no evidence that an escrow agent was agreed upon and engaged, no evidence that escrow instructions were finalized, and lastly no evidence that the certificated Pledged Shares were delivered into escrow.

63.     To the contrary, the Colorado court acknowledged that share placement into escrow "has been prolonged," and PlantSnap's and DEJP's counsel later admitted the settlement documents were still being negotiated. On these undisputed facts, DEJP cannot establish attachment of a consensual security interest in the Pledged Shares.

64.     DEJP has argued that because the Term Sheet is enforceable, DEJP necessarily holds a secured claim. That argument confuses a contractual obligation to proceed with a settlement structure with the distinct requirement that a lien/security interest actually attach to identified collateral. The Term Sheet itself contemplates later definitive settlement documents and the escrow delivery mechanics by which DEJP would obtain recourse to certificated shares upon default.  DEJP's own filings and communications confirm those definitive documents were never finalized and that the secured promissory note was never executed. A secured promissory note that "shall" exist in the future, but never comes into existence, cannot serve as the basis for secured status on the petition date. Furthermore, the Intercreditor Agreement (a substantial material agreement affecting the Debtor's rights) had not even been drafted.  Indeed, the Term Sheet was merely an agreement to agree and did not create a secured interest in the shares.

**E.   A UCC-1 Filing Does Not Create a Security Interest and Cannot Cure Non-Attachment**

65.     The Term Sheet states that Debtor/Ralls "authorizes DEJP to file a UCC-1 financing statement."  Authorization to file a financing statement is not evidence that a security interest attached, and a financing statement does not create a lien by itself.  A UCC-1 is notice; it cannot substitute for proof that the secured transaction contemplated by the parties was actually consummated—particularly where the parties contemplated execution/delivery of a secured note and escrow delivery of certificated shares, and those events never occurred.

**F.   The Absence of Escrow Delivery/Control Confirms DEJP Cannot Carry Its Burden (At Minimum) on Enforceability and Priority**

66.     The parties' own Term Sheet makes escrow delivery of certificated shares (and execution of a blank stock power) the centerpiece of the pledge structure. Yet the record shows recurring, unresolved issues about the escrow agent and physical certificate delivery, and no completed escrow arrangement. Even if DEJP were to argue some interest arose from the Term Sheet, DEJP still

bears the burden to establish facts showing an enforceable lien in certificated collateral as of the petition date. The undisputed record—Term Sheet language, counsel's May 17 status report, numerous e-mail communications between and among counsels, and the Colorado court's acknowledgment that escrow placement was prolonged—shows DEJP cannot meet that burden.

**G.  Debtor Has Standing to Challenge the Secured Designation**

67.    DEJP has asserted that the Debtor lacks standing to object. Courts recognize standing where the classification and secured status of a claim has a direct, concrete effect on the debtor's rights and exposure. Here, DEJP asserts a secured interest in Debtor's equity interest; the secured designation has practical consequences for Debtor and for the administration of property and lien issues. With a likely surplus distribution, Debtor therefore is a proper party in interest to seek reclassification of an improperly asserted secured claim on an undisputed documentary record.

WHEREFORE, PREMISES CONSIDERED, upon notice and hearing, Debtor requests that Alleged Creditor's Proof of Claim No. 10  be recognized as an allowed, unsecured claim against Debtor's estate.  Alternatively, Debtor asserts that the Court can issue such a ruling as a matter of law without a hearing.  Debtor requests that he be granted such other, further and general relief to which he may show himself to be justly entitled.

**DATED this 1ˢᵗ day of February, 2026.**

Respectfully submitted,

**THE MITCHELL LAW FIRM, L.P.**

**/s/   Gregory W. Mitchell**
Gregory W. Mitchell
1100 W. Campbell, Suite 200
Richardson, Texas  75080
Office:  (972)463-8417
Facsimile:  (972)432-7540
State Bar ID:  00791285
E-mail:  greg@mitchellps.com

ATTORNEY FOR DEBTOR

## CERTIFICATE OF SERVICE

I hereby certify that on **February 1, 2026**, a true and correct copy of the foregoing was served via U.S. Mail and/or the court's ECF system to the parties listed below and/or on the attached mailing matrix in accordance with LBR 9007.

THE MITCHELL LAW FIRM, L.P.

<u>/s/ **Gregory W. Mitchell**</u>
Gregory W. Mitchell
Attorney for Debtor

Label Matrix for local noticing
0540-6
Case 24-60504
Eastern District of Texas
Tyler
Wed Jan 28 15:48:24 CST 2026

Patrick R. Akers
Markus Williams LLC
1775 Sherman Street, Suite 1950
Denver, CO 80203-4350

Ally Bank c/o AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118-7901

American Express
PO Box 640448
Dallas, TX 75265

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

Areya Aurzada
PO Box 2105
Addison, TX 75001-2105

Areya Holder Aurzada
Law Office of Areya Holder, P.C.
P.O. Box 2105
Addison, TX 75001-2105

Bank of America, N.A.
PO Box 673033
Dallas, TX 75267-3033

Bill Jaris Consulting, LLC
c/o Joyce W. Lindauer
Joyce W. Lindauer Attorney, PLLC
117 S. Dallas Street
Ennis, TX 75119-4744

Brian Funk
610 South Rome Avenue
Tampa, FL 33606-2588

Brian Funk
c/o Bell Nunnally & Martin LLP
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201-2721

Capital One
PO Box 60599
City of Industry, CA 91716-0599

Diane Carter
333 E Bethany Dr
Ste J120
Allen, TX 75002-3813

Chase Card Services
PO Box 15298
Wilmington, DE 19850-5298

(p)DEJ PARTNERS  LLC
ATTN DANIEL JOHNSON
331 VINELAND AVENUE
CITY OF INDUSTRY CA 91746-2321

Discover Bank
PO Box 3025
New Albany, OH  43054-3025

(p)DISCOVER FINANCIAL SERVICES LLC
PO BOX 3025
NEW ALBANY OH 43054-3025

EarthSnap, Inc.
6691 Park Slope
Tyler, TX 75703

Brian Funk
c/o Bell Nunnally & Martin LLP
2323 Ross Avenue
Suite 1900
Dallas, TX 75201-2721

HI Investments, LLC
Attn:  Ryan K. French (Taylor Porter Law
450 Laurel St., 8th Floor
Baton Rouge, LA 70801
Baton Rouge, LA 70801-1834

JPMorgan Chase Bank, N.A.
s/b/m/t Chase Bank USA, N.A.
c/o Robertson, Anschutz, Schneid,
Crane & Partners, PLLC
6409 Congress Avenue, Suite 100
Boca Raton, FL 33487-2853

Bill Jaris
c/o Joyce W. Lindauer
Joyce W. Lindauer Attorney, PLLC
117 S. Dallas Street
Ennis, TX 75119-4744

Joyce W. Lindauer
Joyce W. Lindauer Attorney, PLLC
117 S. Dallas Street
Ennis, TX 75119-4744

Michael Melito
138 West Fifth Avenue
Denver, CO 80204-5105

Midland Credit Management, Inc.
PO Box 2037
Warren, MI 48090-2037

Russell W. Mills
Bell Nunnally & Martin
2323 Ross Ave.
Suite 1900
Dallas, TX 75201-2721

Gregory W. Mitchell
The Mitchell Law Firm, L.P.
1100 West Campbell Road
Suite 200
Richardson, TX 75080-2951

(c)PATRICK R. AKERS PLAINTSNAP, INC. MOYE WHI
1400 16TH ST STE 600
DENVER CO  80202-1486

Peter W. Thomas DEJ Partners, LLC Thomas, PC
124 West Hyman 1A
Aspen, CO 81611-1717

PlantSnap, Inc.
c/o Dean E. Richardson
3615 Delgany Street, Suite 1100
Denver, CO 80216-3997

Eric Ralls
6691 Park Slope
Tyler, TX 75703

Dean R. Richardson
Gould & Ratner LLP
1801 Wewatta Street
Ste 11th Floor
Denver, CO 80202-6318

Marcus Salitore
Salitore Law PLLC
1400 W. Southwest Loop 323
Suite 50, MB 1012
Tyler, TX 75701-7022

Amalia Y Sax-Bolder
Brownstein Hyatt Farber Schreck, LLP
675 15th Street
Suite 2900
Denver, CO 80202-4287

John Paul Stanford
Quilling, Selander, Lownds, Winslett & M
2200 Ross Avenue, Suite 2400
Dallas, TX 75201-2797

Pete Thomas
Praxidice PC
124 W Hyman 1A
Aspen, CO 81611-1717

U.S. Attorney General
Department of Justice
Main Justice Building
10th & Constitution Ave., NW
Washington, DC 20530-0001

US Trustee
Office of the U.S. Trustee
110 N. College Ave.
Suite 300
Tyler, TX 75702-7231


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

DEJ Partners, LLC
331 Vineland Avenue
City of Commercie, CA 91746

Discover Card
PO Box 30954
Salt Lake City, UT 84130



Addresses marked (c) above for the following entity/entities were corrected
as required by the USPS Locatable Address Conversion System (LACS).

Patrick R. Akers Plaintsnap, Inc. Moye White
1400 16th Street, 6th Floor
Denver, CO 80202



The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(d)Ally Bank c/o AIS Portfolio Services, LLC
4515 N. Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118-7901

(u)HI Investments, LLC

(u)PlantSnap Inc.


End of Label Matrix
Mailable recipients   37
Bypassed recipients    3
Total                 40